[943 NYS2d 23]

STEPHANIE SCALISI, an Infant, by Her Mother and Natural Guardian, MARIA SCALISI, et al., Appellants-Respondents, v MARTIN OBERLANDER et al., Respondents, and EUGENE SI-DOTI, SR., M.D., Respondent-Appellant.

First Department, April 19, 2012

108

## APPEARANCES OF COUNSEL

*Kramer, Dillof, Livingston & Moore*, New York City (*Matthew Gaier, Thomas A. Moore* and *Norman Bard* of counsel), for appellants-respondents.

*Schiavetti, Corgan, DiEdwards, Weinberg & Nicholson, LLP*, New York City (*Samantha E. Quinn* of counsel), for respondent-appellant and Lenore S. Katkin, M.D. and Marian Lombardi, respondents.

*Martin Clearwater & Bell LLP*, New York City (*Barbara D. Goldberg* and *Sean F.X. Dugan* of counsel), for Martin Oberlander, and others, respondents.

*Edward J. Guardaro, Jr.*, White Plains, and *Wilson, Elser, Moskowitz, Edelman & Dicker, LLP*, White Plains, for the Jack D. Weiler Hospital of the Albert Einstein College of Medicine, respondent.

## OPINION OF THE COURT

MANZANET-DANIELS, J.

In December 1997, plaintiff mother, age 27 and pregnant with her first child, came under the care of defendant Dr. Samuel G. Oberlander and his obstetrical group. On August 18, 1998, four days past her due date, plaintiff mother called the obstetric practice, concerned with a perceived decrease in fetal movement. She was instructed to go to the hospital, where she underwent several tests, the results of which were unremarkable. On August 20th, six days past her due date, plaintiff mother underwent a sonogram which showed mild left hydrocephalus with an incidental finding of mild left ventriculomegaly.[1] The nonparty perinatologist who reviewed the films,

---

1. Ventriculomegaly is a brain condition that occurs when the lateral

Dr. Mussalli, recommended follow-up to monitor the hydro-cephalus, but noted that delivery was not indicated unless the hydrocephalus was "progressive."

A follow-up sonogram four days later, on August 24, showed "mild dilation of the intracranial ventricular system (lateral and third ventricles)," with otherwise normal-appearing symmetric intracranial structures.[2] It is heavily disputed by plaintiffs' and defendants' medical experts as to whether these findings—a movement of the condition from the left lateral ventricle to both lateral ventricles and the third ventricle—were indicative of progressive hydrocephalus.[3]

Plaintiff mother was admitted to the hospital on August 26, 1998, for induction of labor. During labor she experienced variable decelerations consistent with compression of the fetal head. She delivered the infant plaintiff vaginally, after a second stage of labor (pushing) lasting more than three hours.

The infant plaintiff was born at 5:44 P.M. on August 27th. The baby weighed six pounds, 10½ ounces, and had Apgar scores of nine at one minute and nine at five minutes. The infant's head circumference at birth was 36 centimeters. A hospital pediatrician, identified as Dr. Vega, was present at the delivery. He noted the results of the August 20th sonogram in the chart, but made no reference to the subsequent sonogram on August 24th. Similarly, the history of plaintiff mother taken by the third-year hospital resident makes no reference to the second sonogram.

The hospital's perinatology unit created a card instructing the labor and delivery staff that the mother had been seen by the maternal fetal assessment team and that the infant required a neurology follow-up after delivery for mild hydrocephalus. This card was never placed in the infant plaintiff's chart, despite express instruction to "PLEASE ATTACH THIS CARD TO THE INFANT'S CHART!" Neither Dr. Vega, nor the hospital neonatologist who reviewed the infant plaintiff's history and examined her shortly after birth, nor the infant

ventricles become dilated.

2. Dr. George Mussalli, the attending physician at the maternal fetal medicine unit at the hospital who interpreted the sonogram, states that it was performed on August 24th, not August 22nd, the date listed on the report. He explained that the maternal fetal unit was closed on August 22nd, a Saturday.

3. Plaintiff mother's obstetrician agreed that the phrasing of the August 24th sonogram report would appear to indicate a progression of the hydrocephalus from one ventricle to three ventricles, but he would not "assume" this was the case until confirmed by the hospital perinatologist.

plaintiff's private pediatrician, referred the infant for a neurological evaluation.

A sonogram of the infant plaintiff's head was performed on August 28th. However, the sonogram was not read until August 31st—after the infant plaintiff had already been discharged.

The report, dated September 1, 1998, indicated hydrocephalus of the left and right ventricles and the third ventricle, and in addition a "suspicio[n]" of a grade II intraventricular hemorrhage (IVH), a condition that may be associated with a traumatic delivery. The report states, inter alia: "The lateral ventricles are enlarged, including the atria, occipital horns and body. The third ventricle is also dilated. In the lateral ventricle there is echogenic focus suspicious for intraventricular hemorrhage."

Dr. Lenore Katkin, the infant plaintiff's private pediatrician, examined the infant plaintiff in the hospital prior to discharge. She testified that she read the infant's chart prior to the examination and was aware that sonograms had been performed both prenatally and postnatally to assess the infant plaintiff's condition. Dr. Katkin conceded that she had not seen the report of the postnatal sonogram when she discharged the infant plaintiff. At the time she examined the infant plaintiff, she did not know the degree of the infant's hydrocephalus, or whether the condition had changed in any way since the prenatal sonograms. She testified that upon discharge the infant's head was not "visibly" enlarged, but conceded that it was impossible to determine, upon physical examination, whether the ventricles were distended in any way.

Dr. Katkin testified that she did not contact the department where the sonogram had been performed to see whether the results were ready since she had a "verbal report" that the postnatal sonogram showed no change. Dr. Katkin was unaware that the postnatal sonogram showed changes suspicious for IVH; she testified that this finding would not have factored into her evaluation of the infant, even though it was known that the infant had hydrocephalus. Plaintiff mother was told to return to the pediatrician in two weeks for a routine appointment, and to schedule a CT scan in one month's time.

The infant plaintiff was next seen by Dr. Sidoti, Dr. Katkin's associate, on September 10, 1998. Dr. Sidoti examined the infant plaintiff and noted a three centimeter increase in the child's head circumference. This measurement placed the infant above the 95th percentile. Dr. Sidoti wrote that prenatal and postnatal

ultrasounds indicated "possible" mild bilateral and third ventricle hydrocephalus, and his impression was a well baby with questionable hydrocephalus. No mention was made of the IVH findings, despite the fact that his office records contained the September 1st sonogram report.

Dr. Sidoti's plan included a possible repeat ultrasound and CT scan and a neurological evaluation in the event head circumference increased or the ventricles appeared larger. He did not, at that time, refer the infant plaintiff for a neurological examination.

When a CT scan was finally performed, on September 24th, it showed "moderate-to-severe enlargement of the lateral ventricles, the third ventricle and the fourth ventricle" and recommended an MRI "to evaluate for prior intraventricular hemorrhage if this was not diagnosed in the past." The impression was

> "1) Dilation of the entire ventricular system, most consistent with communicating hydrocephalus. Normal attenuation in the periventricular white matter suggests that the hydrocephalus is compensated. MRI may be helpful to evaluate for prior intraventricular hemorrhage if this was not diagnosed in the past.

> "2) Cerebellar hemispheric asymmetry, variant vs. old right cerebellar infarct."

Dr. Sidoti referred the infant plaintiff to a pediatric neurologist, nonparty neurologist Dr. Karen Ballaban-Gil, who examined the infant plaintiff that day. In a letter to Dr. Sidoti, the neurologist reported a head circumference of 41.5 centimeters, representing a rapidly accelerating growth on the order of six centimeters in the first month of life, as compared to the normal rate of about two centimeters. The neurologist in addition noted significant hydrocephalus in the lateral third and fourth ventricles. The neurologist referred the infant plaintiff to a neurosurgeon for immediate insertion of a ventriculoperitoneal shunt to decrease the pressure on the infant's brain. The shunt was revised in October 1998, and again in June 1999.

In August 1999, the infant plaintiff began having seizures. In late 2000, the infant plaintiff's neurosurgeon reported that imaging studies showed findings consistent with a Dandy-Walker variant, a congenital condition characterized by malformation of the third ventricle and changes in the posterior

fossa (base of the skull). In 2004 and 2005, the infant plaintiff underwent further procedures resulting in insertion of a new shunt.

At eight years of age, the infant plaintiff was not toilet trained, could not dress herself, could walk only short distances with an unsteady gait, could not run or jump, and required orthotics and a custom stroller/wheelchair to ambulate. She is severely mentally retarded, with limited language abilities.

Plaintiffs commenced this action alleging that the infant plaintiff's injuries had been caused, inter alia, by the failure of the obstetrician defendants to diagnose the infant plaintiff's progressive hydrocephalus and by the delivery of the infant vaginally, rather than by performance of a cesarean section (c-section); by the failure of the pediatrician defendants to monitor the infant plaintiff for signs of both hydrocephalus and IVH, and to promptly refer the infant plaintiff to a neurologist for follow-up treatment and testing; and by the failure of the hospital to recommend delivery via c-section, to refer the infant for neurological follow-up, and to read critical imaging studies until four days following the infant plaintiff's discharge from the hospital.

Defendant hospital moved for summary judgment, relying, inter alia, on the expert affidavit of Dr. George Mussalli. Dr. Mussalli opined that delivery was not indicated based on a diagnosis of mild hydrocephalus, unless it was determined on follow-up that the hydrocephalus was "progressive," i.e., the lateral ventricle was increasing in size and the fetal head was larger than normal. He opined that the second postnatal sonogram, on August 24th, showed no progression of the infant plaintiff's hydrocephalus. He stated that the left ventricle remained only mildly dilated, measuring only 1.4 centimeters, whereas it was noted to be 1.8 centimeters four days earlier. Dr. Mussalli opined that the mild dilation of the third ventricle did not change the diagnosis of mild hydrocephalus. He further opined, upon a review of both prenatal films, that there had been no progression in the hydrocephalus.

The obstetrician defendants moved for summary judgment, relying on the testimony of Dr. Waldman and the expert affidavit of Dr. Gary Mucciolo, an obstetrician/gynecologist. Dr. Mucciolo opined that the obstetrician defendants did not depart from good and accepted medical practice in the care of plaintiff mother and the unborn infant. It was his opinion, within a reasonable degree of medical certainty, that since there was no evi-

dence of progression in the infant plaintiff's hydrocephalus, that defendants were correct in their assessment that a c-section was not indicated or necessary. He opined that the decision to forgo a c-section was not the proximate cause of the infant's developmental delays and neurological impairments. Dr. Mucciolo expressed no opinion concerning the cause of the infant plaintiff's neurological deficits.

The pediatrician defendants moved for summary judgment, relying, inter alia, on the testimony of Dr. Katkin, the affidavit of Dr. Sidoti, and the expert affidavit of Dr. Leon Zacharowicz, a board-certified neurologist with a special qualification in child neurology. Dr. Katkin testified that hydrocephalus does not pose a short-term risk to a newborn. She stated that intervention is indicated when the cause of the hydrocephalus is known, or when there is a major thinning of the brain cortex or a problem with brain function. Dr. Katkin testified that most cases of non-progressive hydrocephalus resolve spontaneously, and that only a small percentage require treatment. Dr. Katkin testified that even had she been told about a possible IVH, the information would not have changed her evaluation or treatment of the infant.

Dr. Sidoti averred that the care provided by Dr. Katkin and himself did not deviate from the accepted standard of care. Dr. Sidoti stated that the results of the August 28th sonogram did not change the plan of action regarding follow-up care for the infant. Dr. Sidoti averred that when he examined the infant plaintiff on September 10th, he was aware of the results of the August 20th and 24th sonograms showing "mild dilation of the intracranial ventricular system (lateral and third ventricles)," consistent with mild communicating hydrocephalus. On the date of the examination, the infant plaintiff's head circumference measured 38 centimeters (representing a three centimeter growth in 11 days). Dr. Sidoti opined that it was within the standard of care not to send the infant plaintiff to a neurologist on September 10, 1998, since it was appropriate to monitor head circumference and/or obtain a CT scan before referring the infant to a neurologist for further evaluation. Dr. Sidoti explained that a newborn's skull is not fused and that open fontanelles allow expansion, which would limit any damage caused by mild hydrocephalus. Dr. Sidoti expressed no opinion concerning the cause of the infant plaintiff's neurological deficits.

Dr. Zacharowicz opined that the pediatrician defendants had not departed from the standard of care in their treatment of the

infant plaintiff, and that the treatment rendered by the pediatrician defendants had not caused the infant plaintiff's alleged injuries. Dr. Zacharowicz opined that the August 24th sonogram was consistent with "mild communicating hydrocephalus," and that the infant plaintiff was born on August 27th with congenital mild hydrocephalus. He opined that the infant plaintiff's neurological examination shortly after birth on August 27, 1998 was normal and did not suggest a need for "urgent intervention." He further opined that it was proper and within the standard of care to monitor head growth before referral to a neurologist, noting that it was possible for the hydrocephalus to become static over the course of a few weeks. He opined that it was within the standard of care and not improper to wait for a CT scan, since serial measurements of head circumference and clinical examinations are of greater value than brain imaging in most cases.

He further noted that upon admission to the hospital for insertion of the shunt the infant plaintiff's fontanelles were "full," but not bulging (the latter an indication of increased intracranial pressure). He opined that it was within the standard of care not to shunt immediately following birth because the infant's skull bones are not fused and the brain and fluid can expand without damage. Dr. Zacharowicz noted that the infant plaintiff's hydrocephalus was consistent with a variant of Dandy-Walker syndrome. Dr. Zacharowicz opined that Dandy-Walker "may" have been the cause of the hydrocephalus and the subsequent claimed injuries, and therefore, that nothing done or not done by the pediatricians could have changed the outcome. Dr. Zacharowicz expressed no opinion concerning whether the postnatal radiographic evidence demonstrated a progression of the infant plaintiff's hydrocephalus, and did not express an opinion concerning the cause of the infant plaintiff's neurological deficits other than his supposition that Dandy-Walker "may" have been the cause of her hydrocephalus and thus of her subsequent claimed injuries.

Plaintiffs opposed the various motions for summary judgment. Plaintiffs' expert obstetrician opined that the hospital's perinatologist should have recommended a c-section, noting that hydrocephalus or ventriculomegaly requires an "atraumatic delivery," since trauma can exacerbate hydrocephalus. The expert opined that regardless of whether or not the infant's hydrocephalus had been determined to be progressive, the finding of ventriculomegaly or hydrocephalus in a post-date infant

requires delivery, specifically, delivery by the atraumatic mode of c-section.

Plaintiffs' obstetrical expert opined that the August 24th postnatal sonogram showed a progression of the hydrocephalus from one to three ventricles, making it even more critical to admit the patient and deliver the infant via c-section. Plaintiffs' expert opined that Dr. Oberlander departed from standards of good and accepted obstetrical practice by following the recommendations of the hospital's perinatologists and in not performing a c-section to reduce the risk of a traumatic delivery in an infant with documented ventriculomegaly, and further violated the standard of care by failing to abandon the delivery plan once the second stage of labor became prolonged[4] and the fetus exhibited multiple variable decelerations indicative of fetal head compression. Plaintiffs' obstetrical expert opined, within a reasonable degree of medical certainty, that the delivery was traumatic, and that the infant sustained head trauma during delivery that contributed to her injuries. Plaintiffs' expert cited as evidence of the traumatic delivery, inter alia, the variable decelerations, the fact that the baby's head measured 36 centimeters in the delivery room but 35 centimeters two days later, indicating swelling attributable to trauma during the delivery, and the impression on the postnatal sonogram of grade II intraventricular hemorrhage.

Plaintiffs' pediatric expert opined, with a reasonable degree of medical certainty, that the infant plaintiff had sustained severe damage as a result of hydrocephalus in the month after birth. The expert opined that since the hydrocephalus went untreated and continued to progress during that time, expanding ventricles and increased intracranial pressure caused damage to the surrounding brain tissue.

Plaintiffs' pediatric expert further opined that the infant plaintiff had sustained head trauma during labor and delivery, citing, inter alia, the numerous variable decelerations, and the finding of IVH, which could have exacerbated preexisting hydrocephalus.

Plaintiffs' expert opined that the hospital's pediatrician and neonatalogist should have immediately ordered a pediatric neurology or neurosurgery consult, since hydrocephalus is an "emergent" condition that can cause brain damage and may

---

4. The second, or "pushing" stage of labor lasted three hours and 19 minutes.

require prompt remedial treatment. Plaintiffs' expert opined, with a reasonable degree of medical certainty, that had a neurologist or neurosurgeon been consulted, the baby would not have been discharged on August 29th, and would instead have been kept in the hospital for further observation and evaluation of her condition, leading in turn to earlier insertion of a shunt. Plaintiffs' expert opined that the prenatal sonograms indicated a progression of the hydrocephalus to the right and third ventricles before birth, and the postnatal sonogram indicated that she continued to have hydrocephalus in three ventricles, no longer described as "mild." The impression of a grade II IVH created a further risk of worsening of the hydrocephalus. The expert described the growth in the infant plaintiff's head circumference in the two-week period prior to the September 10th office visit as "extraordinary."

Plaintiffs' pediatric expert further opined that hospital staff departed from acceptable medical practice in failing to attach to the newborn chart the card generated by the maternal fetal medicine unit indicating the need for neurologic follow-up. The expert opined that the hospital departed from accepted practice in failing to read the sonogram for a four-day period, noting that hydrocephalus is an emergent condition that can be extremely dangerous and may require prompt medical treatment.

Plaintiffs' expert opined that the report of the August 28th sonogram should have been in the chart prior to discharge, and that Dr. Katkin should not have accepted an oral report. The expert opined that the standards of practice required that Dr. Katkin obtain a formal reading of the sonogram before discharging the infant, and to obtain a consultation from a pediatric neurologist or neurosurgeon prior to discharge. Plaintiffs' expert opined that Dr. Katkin should have seen the infant every two or three days, and that waiting a month for a CT scan was "grossly improper."

Plaintiffs' pediatric expert further opined that it was a departure for Dr. Sidoti not to order an immediate CT scan and neurologic evaluation on September 10th, and to wait an additional two weeks before referring the infant plaintiff to a neurologist. Plaintiffs' expert noted that Dr. Sidoti was aware of the results of the August 28th sonogram (showing progression of the hydrocephalus, as well as suspicion of a grade II IVH) and was aware that the infant plaintiff's head circumference had increased by three centimeters in just 11 days, yet declined

to make the necessary referrals. Plaintiffs' expert opined, with a reasonable degree of medical certainty, that had Dr. Sidoti referred the infant for evaluation on September 10th, it would have been determined that her hydrocephalus was significantly progressing and required prompt insertion of a shunt to avoid brain damage.

Plaintiffs' expert neurologist opined, with a reasonable degree of medical certainty, that the infant plaintiff had sustained severe brain damage attributable to hydrocephalus in the month after birth. Since the hydrocephalus went untreated and continued to progress during that time, expanding ventricles and increased intracranial pressure caused damage to surrounding brain tissue. Plaintiffs' neurologist stated that the prenatal and postnatal sonograms showed gradually progressing enlargement of the ventricular system, and that the postnatal sonogram showed a grade II IVH not present on either of the prenatal sonograms. He opined that this IVH was sustained during labor and delivery, further noting that IVH can both cause hydrocephalus and exacerbate preexisting hydrocephalus. The neurologist noted that when the infant plaintiff was examined on September 10th, her head circumference had increased more than three centimeters in the 11 days since her discharge from the hospital, which he characterized as an "extraordinarily rapid rate of growth," indicative of a significant progression of the hydrocephalus during the neonatal period. He noted that the September 24th CT scan showed "severe" hydrocephalus.

Plaintiffs' expert opined, with a reasonable degree of medical certainty, that the radiological and physical findings demonstrated continually progressing hydrocephalus from August 20th through September 24th that was congenital in origin and exacerbated by IVH, and that this untreated hydrocephalus caused severe damage to the infant plaintiff's brain. The expert noted that subsequent medical records indicate that the infant's neurologic condition was carefully monitored from September 24, 1998 onward, and that although the infant required several shunt revisions, she never again suffered a degree of hydrocephalus significant enough to damage the brain.

The expert opined further that the baby had sustained additional head trauma during the labor and delivery which contributed to the IVH and exacerbation of her hydrocephalus. The expert opined that the infant should have been evaluated by a neurologist after delivery and should not have been

discharged until such evaluation had been obtained. The expert opined that had the infant been so monitored, it would have been determined within a matter of days that her hydrocephalus was progressing at a dangerous rate, and that insertion of a shunt was necessary. He noted that the rapid rate of head growth, alone, would have been "patent" after a few days, and additional imaging studies would have confirmed that the ventricles were continuing to expand. Plaintiffs' neurologist opined that Dr. Sidoti should have referred the infant to a neurologist on September 10th, when he saw that her head circumference had increased by over three centimeters and was then above the 95th percentile. The neurologist stated that severe hydrocephalus can cause damage to the white matter of the brain without bulging fontanelles, contrary to the assertion of defense expert Dr. Zacharowicz. The expert noted that the September 24th CT showed marked expansion of the ventricles with compromise of the white matter. Finally, the neurologist concluded that the finding of a Dandy-Walker variant was "irrelevant" to the infant plaintiff's injuries, and, in any event, that the infant did not have the cerebellar attributes of a Dandy-Walker malformation. Moreover, the expert opined that hydrocephalus accompanying Dandy-Walker syndrome or variant is treatable, and that insertion of a shunt would have prevented the infant plaintiff's brain damage.

Plaintiffs' expert neuroradiologist opined that the August 24th sonogram demonstrated dilation and increases in the sizes of the lateral ventricles and third ventricle as compared to the August 20th sonogram, and that these findings denoted a progression of the hydrocephalus. The radiologist found that the August 28th postnatal sonogram demonstrated an increase in the hydrocephalus as compared to the prenatal sonograms, and that the postnatal sonogram "clearly" showed an intraventricular hemorrhage grade II, consistent with head trauma sustained during a vaginal delivery. The expert opined that good and accepted practice, in the case of an infant with hydrocephalus, a potentially emergent condition that may require prompt treatment, necessitated reading and reporting of the sonogram's results within 24 hours.

The motion court dismissed the complaint as against all defendants with the exception of Dr. Sidoti. The court reasoned that the decision to deliver vaginally, while made in consultation with hospital perinatologists, was ultimately that of plaintiff mother's private physician. The court noted, in any

event, that the evidence showed that a vaginal delivery was not contraindicated in cases of hydrocephalus. The court found no indication that hospital staff who performed and read the sonograms had failed to communicate with the referring doctors or that a delay in communicating the results of the sonograms would have made any difference in the treatment of the infant plaintiff. The court reasoned that given the infant's normal status at birth, there was "no evidence" to support the claim that the infant should have been further monitored and shunted earlier. The court stated that even assuming, arguendo, that the hospital had departed from accepted medical practice, there was no evidence that the congenital hydrocephalus was more than mild at the time of discharge, even if it had progressed, and no evidence that the condition had caused brain damage by the time of discharge from the hospital.

The court found that the obstetrician defendants were entitled to summary judgment essentially for the same reasons, and that Dr. Katkin was entitled to summary judgment since at the time of discharge the infant plaintiff had a normal examination. The court, however, found a triable issue of fact as to whether Dr. Sidoti had departed from accepted medical practice, citing the fact that by September 10th, the infant plaintiff's head had become "pronouncedly" large, in the 95th percentile.

The court took issue with the assumption of plaintiffs' experts that damage had occurred during the first month of life, stating that this conclusion ignored evidence of repeated shunt failures.

We now modify. A defendant in a medical malpractice action establishes prima facie entitlement to summary judgment when he or she establishes that in treating the plaintiff he or she did not depart from good and accepted medical practice or that any such departure was not the proximate cause of the plaintiff's alleged injuries (see Thurston v Interfaith Med. Ctr., 66 AD3d 999 [2009]). Once a defendant doctor meets his or her burden, the plaintiff must rebut defendant's prima facie showing via medical evidence attesting that the defendant departed from accepted medical practice and that such departure was a proximate cause of the injuries alleged (see id.).

In reaching its conclusion that plaintiffs' submissions failed to raise a triable issue of fact as to the negligence of the hospital, the obstetrical defendants, and the pediatric defendants other than Dr. Sidoti, the motion court improperly engaged in fact-finding, discounted the affidavits of plaintiffs' experts, and substituted its own medical judgment. The motion court

concluded that the infant plaintiff's brain damage could not have occurred during the first month of life since she was not exhibiting signs of alleged distress, and that neurological damage occurred at some later, unspecified point when the infant's shunt malfunctioned.

However, plaintiffs' experts opined that since no further significant increases in ventricular size or intracranial pressure occurred after the first month of life, the damage had already been done—thus ruling out any subsequent alleged shunt malfunction as the cause of the infant plaintiff's brain damage. The infant plaintiff's neurological sequelae are severe, and are not the inevitable outcome of having a congenital variant of Dandy-Walker.[5] It was therefore medically reasonable for plaintiffs' experts to arrive at the conclusion that these sequelae are in significant part attributable to the actions of the various defendants in failing to recognize the signs of a progressive hydrocephalus, in failing to properly monitor an infant whose imaging studies showed both progressive hydrocephalus and possible IVH, and in discharging the infant without a plan for neurological follow-up, despite the objective, positive findings documented in the imaging studies. The motion court erroneously disregarded plaintiffs' experts' opinions on causation and engaged in improper fact-finding in concluding that defendants' actions had not contributed to her brain damage.

█ The motion court erred in making a factual determination that brain damage occurred at some later, unspecified point in time, when the shunt is alleged to have "malfunctioned." Notably, not one defense expert makes this assertion.[6] Defendants' theory that brain injury occurred at some later point in time is

---

5.  The fact that the infant plaintiff may or may not have a variant of Dandy-Walker does not absolve defendants from failing to properly monitor and treat the hydrocephalus that is characteristic of the condition. Indeed, carrying this argument to its logical extreme, one might argue that a doctor can never be at fault for failing to treat a condition that he or she did not affirmatively cause. Yet the law recognizes malpractice for failure to act.

6.  Defendants' experts, while opining that defendants' actions had not caused the infant plaintiffs' neurological deficits, expressed no opinion concerning the cause of the infant plaintiff's injuries. Dr. Zacharowicz came closest in stating that Dandy-Walker "may" have caused the infant's hydrocephalus and therefore her injuries, but made no attempt to pinpoint the period during which the infant plaintiff sustained injuries (whether by correlating such injuries to increases in intracranial pressure or otherwise), and did not affirmatively opine that she did indeed suffer from Dandy-Walker. In any event, whether or not Dandy-Walker is the cause of the infant plaintiff's hydrocephalus, defendants may still be liable for failing to properly monitor the condition.

predicated on the testimony of plaintiff mother and the operative reports of the neurosurgeon who placed the shunt. Yet nowhere in this testimony or in these reports does the mother or the neurosurgeon attribute the infant plaintiff's brain damage to alleged shunt malfunction. Indeed, the assessment of the neurosurgeon in the hospital record refers to the infant's "delayed development" and notes a "lack of association with shunt malfunction."

The motion court further erred in making a factual determination that the infant had never sustained an IVH because a cerebrospinal fluid sample taken at the time of the shunt insertion allegedly showed otherwise. The record contains no expert opinion that the fluid sample demonstrated that the infant plaintiff had not sustained an IVH a month earlier.

Similarly, the motion court found that a vaginal delivery was not contraindicated, yet plaintiffs' experts clearly opined that an atraumatic delivery was necessary because the infant plaintiff had hydrocephalus, whether characterized as progressive or not.

The motion court's opinion, while long, underscores the difficulties of courts grappling with complex medical evidence and trying to identify triable issues of fact, as opposed to propositions that lack medical foundation. In making this assessment, a motion court is not to substitute its own medical judgment for that of the parties' experts, or to surmise, as did the court here, that because the infant plaintiff appeared normal shortly after birth, she had not sustained a brain injury, or a severe enough injury, so as to result in the neurological sequelae she now exhibits today.

■ Plaintiffs' proofs showed that the infant plaintiff was diagnosed with mild hydrocephalus prior to birth, that the radiological evidence both before and shortly after birth indicates a progression of said condition (whether this was indeed the case is a matter for trial; it suffices, at this stage, that there are conflicting medical opinions on the issue), that the results of critical imaging studies were not promptly read,[7] that hydrocephalus is an "emergent" condition that requires careful monitoring, and that failure to monitor the condition resulted in brain damage, damage that in this case was exacerbated by a possible grade II IVH.

---

7. It was not reasonable for the motion court to presume that because the infant plaintiff appeared "normal," the results of these studies were in some sense superfluous.

■ The affidavits of plaintiffs' experts raise triable issues of fact as to whether the actions of the respective defendants caused or contributed to the infant plaintiff's brain damage. Plaintiffs' obstetrical expert opined that hospital perinatologists departed from the standard of care in failing to recommend a c-section for a post-due mother with an infant with hydrocephalus. The expert explained that an atraumatic delivery was required since trauma to the baby's head can exacerbate hydrocephalus. The expert further opined that the progressive nature of the hydrocephalus made it even more imperative to deliver the baby via c-section. The record showed that plaintiffs' private obstetrician formulated plans for high-risk patients in conjunction with hospital perinatologists, and that they relied on the perinatologists for advice, including how to manage a delivery with hydrocephalus. The hospital perinatologists may thus be held liable for any negligence in their recommendations or in their reading of ultrasounds (*see Santos v Rosing*, 60 AD3d 500 [2009]; *see also Raptis-Smith v St. Joseph's Med. Ctr.*, 302 AD2d 246, 247 [2003]). Indeed, we have previously affirmed the denial of summary judgment in a case involving co-management between private obstetricians and perinatologists at the very same defendant hospital (*see Frye v Montefiore Med. Ctr.*, 70 AD3d 15 [2009]).

■ Plaintiffs' pediatric and neurological experts opined that the hospital departed from the standard of care by failing to order a neurologic or neurosurgical consultation for an infant with hydrocephalus, an emergent condition that can cause brain damage if not properly monitored and treated. Plaintiffs' expert neurologist opined that the hospital was negligent in failing to evaluate the infant and the relevant radiological studies prior to discharge. Experts similarly opined that the hospital departed from proper practice in failing to attach to the infant's chart the card calling for neurological follow-up after delivery. Thus, plaintiffs have adequately raised a triable issue of fact with respect to the negligence of defendant hospital in their treatment of the infant (*see Gerner v Long Is. Jewish Hillside Med. Ctr.*, 203 AD2d 60 [1994] [hospital concurrently liable with private pediatrician for failing to properly diagnose and treat infant's jaundice where, inter alia, nurses failed to record any jaundiced condition, or make any reference to color, until the third day of life, even though the parents had complained to hospital personnel since the infant's birth; and the hospital laboratory did not timely report results or timely carry out the pediatrician's orders for phototherapy]).

■ Plaintiffs' experts similarly raise a triable issue of fact as to whether departures by plaintiff's private obstetrician contributed to the infant plaintiff's brain damage. Plaintiffs' obstetrical expert opined, as discussed supra, that given the evidence of hydrocephalus in a post-term infant, plaintiffs' obstetrician should have performed an atraumatic c-section, rather than risk a vaginal delivery, which might exacerbate the infant's condition.

Finally, plaintiffs' experts raise a triable issue of fact as to whether the actions of pediatricians Dr. Katkin and Dr. Sidoti, in failing to recognize the radiographic evidence of a progression of the infant's condition, and in failing to promptly refer the infant for neurological consultation, contributed to the infant's brain damage. Plaintiffs' experts noted, inter alia, that Dr. Katkin discharged the infant plaintiff without first receiving a report of the formal reading of the postnatal sonogram, instead relying on an "oral report" from an unspecified member of the nursery staff for this critical information. The experts explained that hydrocephalus can cause damage to the brain, even without bulging fontanelles. Plaintiffs' pediatric and neurological experts further opined that Dr. Sidoti should have referred the infant for a neurological evaluation on September 10th, after documenting that the infant plaintiff's head circumference had grown three centimeters in 11 days' time.

■ Since an issue of fact exists as to whether Dr. Lombardi and Drs. Sidoti and Katkin were partners in a general partnership, the complaint should be reinstated as against the estate of Dr. Lombardi (see Partnership Law §§ 24, 26; see e.g. Fanelli v Adler, 131 AD2d 631 [1987]). However, the complaint was appropriately dismissed as against Dr. Waldman, since the evidence showed that at the time of the infant plaintiff's delivery he was merely an employee of the obstetrical practice, and that plaintiff mother was under the care of Dr. Oberlander, who made the relevant decisions as to the plan for delivery.

Accordingly, the judgment of the Supreme Court, Bronx County (Barry Salman, J.), entered October 1, 2010, dismissing the action against all defendants except Eugene Sidoti, Sr., M.D., and bringing up for review an order, same court and Justice, entered August 25, 2010, to the extent it granted said defendants' motions for summary judgment dismissing the complaint, should be modified, on the law, vacated as to defendants Katkin, Oberlander and Lombardi and defendant hospital, and the complaint reinstated as against defendants Katkin, Oberlander

and Lombardi and defendant hospital, and otherwise affirmed, without costs. Plaintiffs' appeal from the August 25, 2010 order should be dismissed, without costs, as subsumed in the appeal from the judgment. The foregoing order, insofar as it denied defendant Sidoti's motion for summary judgment, should be affirmed, without costs.

SWEENY, J.P., DEGRASSE and ROMÁN, JJ., concur.

Judgment, Supreme Court, Bronx County, entered October 1, 2010, modified, on the law, vacated as to defendants Katkin, Oberlander and Lombardi and defendant hospital, the complaint reinstated as against said defendants, and otherwise affirmed, without costs. Plaintiff's appeal from order, same court and Justice, entered August 25, 2010, dismissed, without costs, as subsumed in the appeal from the judgment. The foregoing order, insofar as appealed from by defendant Sidoti, affirmed, without costs.