■ JESSICA TORRES, Appellant, v IRENE G. CERGNUL, M.D., et al., Respondents, et al., Defendants. [45 NYS3d 55]—

Order, Supreme Court, Bronx County (Douglas E. McKeon, J.), entered April 21, 2015, which, insofar as appealed from, granted defendants Irene G. Cergnul, M.D. and Bronx-Lebanon Hospital Center's motion for summary judgment dismissing the complaint as against them, reversed, on the law, without costs, and the motion denied.

Defendants Dr. Cergnul and Bronx-Lebanon established prima facie that they did not depart from the accepted standard of medical care in diagnosing and treating plaintiff's 2006 ectopic pregnancy (*see Scalisi v Oberlander*, 96 AD3d 106, 120 [1st Dept 2012]). Their expert opined that Dr. Cergnul provided appropriate care when she saw plaintiff on June 6 and ordered a repeat BhCG (a hormone produced during pregnancy) test, that no further tests were necessary that day because plaintiff was stable, and that it was appropriate and proper for the attending doctor at defendant Bronxcare MBD Family Practice Clinic (MBD) on June 7 to receive the laboratory reports, which

indicated that the pregnancy was likely resolving by itself. With respect to plaintiff's June 22 visit to Bronx-Lebanon's emergency room, where the attending physician told plaintiff that he was too busy to perform diagnostic laparoscopy and would only perform a more invasive procedure, the expert opined that Bronx-Lebanon's staff fully explained to plaintiff the risks of her signing out against medical advice, and that there was in any event no immediate need for surgical intervention because plaintiff was stable. Defendants' expert further opined that neither Dr. Cergnul's treatment nor the performance of a salpingectomy at Bronx-Lebanon on June 23 caused plaintiff's fallopian tube to rupture.

In opposition, plaintiff raised issues of fact by submitting the report of an expert who opined that, in light of plaintiff's symptoms, which were indicative of an ectopic pregnancy, and medical history, which included a previous ectopic pregnancy, Dr. Cergnul should have followed up with plaintiff immediately after the results of the BhCG test she ordered on June 6 became available, and that as a result of her failure to do so, plaintiff lost the opportunity to be timely treated with methotrexate and avoid a ruptured fallopian tube (see Dallas-Stephenson v Waisman, 39 AD3d 303, 307 [1st Dept 2007]). Defendants contend that the report should not have been considered, because the expert's name had been redacted from it. However, they did not object to the redaction (see CPLR 3101 [d] [1] [i]); therefore, the report was properly considered (see Vega v Mount Sinai-NYU Med. Ctr. & Health Sys., 13 AD3d 62 [1st Dept 2004]).

Defendants contend that plaintiff was solely at fault because, they allege, she was told to return to MBD two days later and failed to do so. However, there is no evidence in the record that an appointment was ever made for plaintiff for June 8.* Accordingly, the evidence presents issues of fact as to whether an appointment was scheduled and missed, whether Dr. Cergnul breached the standard of care by not following up with plaintiff after the June 7 BhCG test results became available (whether or not the alleged appointment was missed), and the apportionment of fault. Defendants' reliance on cases limiting the duty of consulting physicians is misplaced (see Sawh v Schoen, 215 AD2d 291, 294 [1st Dept 1995]; Lipton v Kaye, 214 AD2d 319 [1st Dept 1995]). Dr. Cergnul was actively involved in plaintiff's treatment, even if she was not plaintiff's primary physician.

---

* The dissent appears to read Dr. Cergnul's note dated June 6, 2006, which orders the repeat BhCG test on June 7, and "F/U on Thursday" (June 8), to indicate that plaintiff was advised to return to MBD on June 8. We disagree that this is the only possible interpretation.

The dissent views plaintiff's expert's opinion regarding Dr. Cergnul's failure to follow up with plaintiff as soon as the June 7 BhCG test results were available as "speculative," citing *Rivers v Birnbaum* (102 AD3d 26, 44 [2d Dept 2012]). In that case, more than a year passed between defendant's alleged misinterpretation of pathology slides and plaintiff's cancer diagnosis, and the Court found that plaintiff's expert's assertion that the correct diagnosis a year earlier would have led to appropriate treatment was speculative (*id.* at 32, 44). Here, plaintiff received what even Dr. Cergnul agrees was the appropriate treatment, methotrexate therapy. Plaintiff's expert asserts, however, that the treatment would have been more effective, preventing the loss of plaintiff's remaining fallopian tube, had it been administered as soon as Dr. Cergnul had the June 7 BhCG test results. Dr. Cergnul's colleague, Dr. Borne, did on June 16 exactly what plaintiff's expert said Dr. Cergnul should have done a week earlier: send plaintiff to the emergency room to rule out ectopic pregnancy and receive appropriate treatment for her emergent condition. At the hospital, ectopic pregnancy could not be ruled out, and plaintiff was offered and accepted treatment with methotrexate. Dr. Cergnul testified that she was "relieved" when she later learned that plaintiff had received methotrexate, indicating her agreement that this was the appropriate treatment. Plaintiff's expert notes that "[i]t is widely recognized that the success of methotrexate therapy is significantly greater when introduced earlier in the pregnancy (when BhCG level is below 3,000)—and that the risk for failure, as was later experienced in this patient, is greater the longer the amount of time elapsing between conception and introduction of Methotrexate therapy." In the eight days between when the June 7 BhCG results were available to Dr. Cergnul (who testified that she could not recall if she ever saw them) and when plaintiff went to the hospital, plaintiff's BhCG levels had risen from 743.4 to 7,096.5. Accordingly, plaintiff's expert's opinion is based on facts in the record and is not speculative.

Plaintiff's expert's report also raised an issue of fact as to whether Bronx-Lebanon departed from medical standards by failing to provide plaintiff with the option of immediate surgical intervention, in particular, diagnostic laparoscopy, on June 22, when she presented with lower left quadrant and pelvic pain, cramping, and vaginal bleeding since the previous night. Defendants contend that they cannot be held liable for plaintiff's refusal, against medical advice, to undergo immediate surgery (*see Ingutti v Rochester Gen. Hosp.*, 114 AD3d 1302 [4th Dept 2014], *appeal dismissed* 23 NY3d 929 [2014]).

However, an issue of fact exists as to whether plaintiff was offered any meaningful option for surgical intervention, i.e., a procedure that would leave her remaining fallopian tube intact. Moreover, defendants' expert's opinion that there was no need for immediate surgical intervention because plaintiff was stable is undermined by the advice given by Bronx-Lebanon's own staff and in any event directly contradicted by plaintiff's expert (*see Frye v Montefiore Med. Ctr.*, 70 AD3d 15, 25 [1st Dept 2009]).

Our dissenting colleagues assert that plaintiff was offered an exploratory laparotomy. However, as the dissenting opinion acknowledges, this surgical procedure is far more invasive than the diagnostic laparoscopy that plaintiff had previously scheduled for the following day and would have preferred to have on June 22. Plaintiff's expert states that a laparotomy was also "far less appropriate" than a diagnostic laparascopy, and "unnecessary" under the circumstances. Furthermore, plaintiff testified that her understanding of what the Bronx-Lebanon physician told her was that he would "do a surgical procedure to remove my fallopian tube because he had a lot of surgeries and he was in a rush," and that "[i]f I didn't want him to perform the surgery now, then I'd have to sign myself out of the hospital." Accordingly, plaintiff has clearly raised an issue of fact as to whether she was offered an appropriate option.

Contrary to defendants' contention, issues of fact also exist as to whether the delay in performing surgery was a proximate cause of plaintiff's ruptured fallopian tube (*see e.g. Lesniak v Stockholm Obstetrics & Gynecological Servs., P.C.*, 132 AD3d 959 [2d Dept 2015]). Defendants argue that their conduct could not have proximately caused the rupture of plaintiff's fallopian tube because intraoperative rupturing is a well known risk of even a non-negligently performed salpingostomy. However, this argument assumes that the rupture occurred during surgery, while the record is equally consistent with the fallopian tube having already ruptured before surgery. The dissent posits that plaintiff failed to present evidence supporting this. However, as plaintiff's expert noted, the operative report states that, after adhesions were removed from the fallopian tube, "it was noted that there was a ruptured site." Furthermore, defendants' own expert opined that "the performance of the salpingectomy did not cause the plaintiff's fallopian tube to rupture." Concur—Moskowitz, Gische and Gesmer, JJ.

Friedman, J.P., and Andrias, J., dissent in a memorandum by Andrias, J., as follows: I disagree with the majority's conclu-

sion that plaintiff's expert's affidavit raises a material issue of fact as to whether defendants Irene G. Cergnul, M.D. and Bronx-Lebanon Hospital Center departed from the accepted standard of medical care in diagnosing and treating plaintiff's 2006 ectopic pregnancy and proximately caused the rupture and removal of her left fallopian tube. The affidavit fails to address the prima facie showing in the detailed affidavit by defendants' expert, and proffers speculative opinions contrary to or otherwise unsupported by the evidence. Accordingly, I respectfully dissent.

After a positive home pregnancy test, on June 2, 2006, plaintiff went to see defendant Deborah E. Borne, M.D., her primary care doctor, at defendant Bronxcare MBD Family Practice Clinic (MBD). Plaintiff, then 30 years old, had previously given birth to three children, and had had an ectopic pregnancy that resulted in the removal of her right fallopian tube.

Plaintiff's beta human chorionic gonadotropin (BhCG) level, an indicator of pregnancy, was reported to be 1975 miU/mL, and the assessment was intrauterine pregnancy at approximately six weeks by the last menstrual period. Dr. Borne referred plaintiff to Third Avenue Radiology, where a June 5, 2006 ultrasound confirmed an intrauterine pregnancy of approximately 4.6 weeks' gestational size. A repeat BhCG taken that day reflected a decrease in plaintiff's levels from 1975 to 1415 miU/mL.

On June 6, 2006, plaintiff returned to MBD as a "[w]alk-in" and saw Dr. Cergnul for the first time. Plaintiff complained of abdominal pain accompanied by vaginal spotting, and Dr. Cergnul's diagnosis was a "[l]ikely miscarriage." However, considering the possibility of an ectopic pregnancy, Dr. Cerngul ordered a third BhCG test for June 7 and noted in her records, "F/U [follow up] on Thursday" (June 8).

Plaintiff returned to MBD as directed on June 7 for the repeat BhCG, which was sent to a laboratory. While the test report indicated that plaintiff's BhCG levels had further decreased, Dr. Cergnul testified that she did not initially see the results, which would have been forwarded to MBD and reviewed by the attending physician on duty when they were received on June 8. However, Dr. Cergnul did testify that the test showed a BhCG level of 743 miU/mL, "which indicates loss of pregnancy." MBD's notes addressing the results of the test state that plaintiff was told she would "pass [the] pregnancy on [her] own."

On June 15, 2006, Dr. Cergnul contacted plaintiff to advise

her of other test results, and asked that she return to MBD. On June 16, 2006, Dr. Borne examined plaintiff, who complained of severe left lower quadrant pain, and told her to go to an emergency room to rule out a possible ectopic pregnancy. That evening, plaintiff went to Lincoln Hospital, where she was seen by several members of the gynecological staff.

Lincoln's records indicate that plaintiff's BhCG level was 7096.5 miU/mL "without a gestational sac in the uterus" and that an ectopic pregnancy could not be definitively ruled out. After consultation regarding the pros and cons of using medicine or surgical intervention, plaintiff opted for the former and was given a dose of methotrexate (MTX), a medication that inhibits rapid reproduction of cells, including fetal cells. Plaintiff was advised to return to Lincoln on June 21, 2006 for an initial follow-up to monitor the MTX's effectiveness.

On June 19, 2006, plaintiff, complaining of left lower abdominal pain, returned to MBD and informed Dr. Cergnul that she had been given an MTX shot at Lincoln. Concerned about plaintiff's lack of follow-up, Dr. Cergnul ordered another BhCG test, which revealed a level of 7,758 miU/mL.

On June 21, 2006, plaintiff presented to Dr. Borne with pain and mild vaginal spotting. After noting no change in plaintiff's elevated BhCG level, Dr. Borne prepared a consultation request for Dr. Coley at Bronx-Lebanon, where a transvaginal ultrasound revealed "No IUP [intrauterine pregnancy]" and "no distinct ectopic seen." However, Dr. Coley's assessment/plan stated: "Likely ectopic pregnancy [status post] Methotrexate administration on 6/17/06. [Patient] very stable. No free fluid in abdomen. No pain. No bleeding. [Patient] [status post] [right] salpingectomy in past for [right] ectopic, desires future fertility. ¶ In light of stable [patient] who desires future fertility and has only [left] tube remaining will have [patient] return 6/23 for repeat BhCG. Will put [patient] on schedule for laparoscopic salpingostomy if BhCG not significantly decreased on 6/23. Will proceed [with] surgery the same day. ¶ Patient given *strict* ectopic precautions to return [with] *any* pain to ER immediately."

Plaintiff understood the procedure to be performed as follows: "[T]hey can look inside to see what is wrong . . . and if it was an ectopic pregnancy, they would try to remove the pregnancy and salvage my fallopian tube, but if it was too bad, they had to do what they had to do."

On June 22, 2006, at approximately 1:00 p.m., plaintiff presented to Bronx-Lebanon's emergency room, complaining of pelvic pain, left lower quadrant pain, and cramping. She was

triaged by Edmund Yamoah, P.A., who noted "high suspicion for [left] ectopic pregnancy." At or around 3:50 p.m., plaintiff was seen by the attending OB/GYN, Dr. Phabillia Afflack, who admitted her to gynecology and placed her on call to the operating room. Plaintiff signed a consent form authorizing a "laparoscopy, possible laparotomy, possible oopherectomy [sic], [and] possible salpingostomy." A few hours later, she was seen by the then-attending OB/GYN Dr. Allen, whose contemporaneous notes state, "[Patient] seen by Dr. Afflack today. [Patient] scheduled for diagnostic laparoscopy, possible salpingectomy. Discussed care [with patient]. [Patient] told strong likelihood of ectopic pregnancy [left] side. Advised laparotomy, possible salpingostomy, possible salpingectomy or Methotrexate therapy versus Admission[.] [P]roceed [with] diagnostic laparoscopy in daytime 6/23/06 [with] Dr. Coley. I [illegible] [patient] that [illegible] labor and delivery. Don't have time to do a diagnostic laparoscopy. [Patient] refuses to do an exploratory laparotomy. [Patient] states that she prefers a diagnostic laparoscopy [with] Dr. Coley in A.M. [Patient] advises admission to GYN service for a diagnostic laparoscopy in pm. [Patient] does not want to stay in hospital. [Patient] wants to sign out AMA [and] return in A.M. for a diagnostic laparoscopy [with] Dr. Coley. Risk of rupture, hemorrhage [and] death [discussed with] [Patient]. [Patient] still wants to sign out AMA return in A.M. [Patient] advised to return to hospital ASAP if [increased] abdominal pain, vaginal bleeding, . . . etc."

Plaintiff testified that Dr. Allen told her he was in a "rush" and would have to remove her fallopian tube. She decided to wait for her scheduled procedure with Dr. Coley the next morning, because she was "scared" and did not want to "remove [her] only chance of having another pregnancy" without having someone "go in and look first." The Departure Against Medical Advice form signed by plaintiff states: "[Patient] understands risks of death [secondary] to rupture of ectopic pregnancy & refuses to stay in hospital [patient] states she will return tomorrow for admission. She states there that she will return if she has any severe pain immediately."

On June 23, 2006, plaintiff presented to Dr. Coley at Bronx-Lebanon for surgery. Her BhCG level was retested, and remained at the relatively same elevated level, demonstrating the failure of the MTX to terminate her pregnancy. Accordingly, Dr. Coley undertook to perform the diagnostic laparoscopy. During the procedure, the ectopic pregnancy was confirmed. Plaintiff's left fallopian tube was also found to be "grossly distended" with "extensive adhesions." When the adhe-

sions were removed, "it was noted that there was a ruptured site along the inferior aspect of the fallopian tube." Dr. Coley attempted to perform a salpingostomy, but ultimately performed a salpingectomy instead, because "the extreme dilation of the fallopian tube as well as the ruptured fimbriated end and a history of 2 ectopic pregnancies" made it "unlikely that the patient would have a successful pregnancy with the damaged fallopian tube."

Plaintiff alleges, inter alia, that Dr. Cergnul and Bronx-Lebanon were negligent in failing to diagnose that she was suffering from an ectopic pregnancy and/or that this condition was an emergent and/or emergency situation requiring immediate care and treatment, which caused her to suffer a ruptured left fallopian tube, subsequent removal of her left fallopian tube, and consequent infertility. The issue before us is whether the motion court erred in granting Dr. Cergnul and Bronx-Lebanon summary judgment dismissing the complaint as against them.

In moving for summary judgment dismissing a complaint alleging medical malpractice, a defendant must establish, prima facie, either that there was no departure or that any departure was not a proximate cause of the plaintiff's injuries (*see Scalisi v Oberlander*, 96 AD3d 106, 120 [1st Dept 2012]). Once such a showing has been made, the plaintiff "must submit evidentiary facts or materials to rebut the prima facie showing by the defendant physician that he [or she] was not negligent in treating plaintiff so as to demonstrate the existence of a triable issue of fact" (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]).

Dr. Cergnul and Bronx-Lebanon established, prima facie, their entitlement to summary judgment by submitting the expert opinion of Shonda Corbett, M.D., which addressed plaintiff's allegations and established that the treatment of plaintiff was within and in accordance with good and accepted practice and, in any event, was not the proximate cause of plaintiff's injury.

Dr. Corbett opined that Dr. Cergnul acted appropriately on June 6, 2006, by obtaining a medical history from plaintiff and reviewing her chart and the June 5, 2006 sonogram, which showed a single intrauterine gestational sac of approximately 4.6 weeks and did not identify a fetal pole or a yolk sac, which could signify an ectopic pregnancy. Further, based on that sonogram, plaintiff's complaints of intermittent vaginal spotting, and the decrease in plaintiff's BhCG values from 1975 to 1415, Dr. Cergnul's working diagnosis of a possible miscarriage and her differential diagnosis of a possible ectopic pregnancy

were correct and appropriate. Because plaintiff's vital signs were all within normal range and she was stable, a repeat sonogram or referral to an emergency room or specialist was not warranted, and ordering the repeat BhCG test was the appropriate course of action.

Dr. Corbett further opined that when Dr. Cergnul next saw plaintiff on June 19, 2006, she did not ignore plaintiff's signs and symptoms, but obtained a proper medical history, performed a proper, appropriate and thorough examination and workup, and acted appropriately in ordering a repeat BhCG test to determine if the MTX shot that plaintiff had received three days earlier had been effective. Plaintiff was stable, her vital signs were normal, and no further tests or treatment was warranted.

As to Bronx-Lebanon, Dr. Corbett opined that on June 21, 2006, Dr. Coley properly and thoroughly examined and treated plaintiff. The ultrasound taken that day showed no intrauterine pregnancy and no distinct ectopic pregnancy. Plaintiff was stable, with no complaints of pain or bleeding, and Dr. Coley properly diagnosed a likely ectopic pregnancy status post MTX administration. Dr. Coley also acted appropriately in ordering a repeat BhCG test, scheduling plaintiff for a laparoscopic salpingostomy on June 23, 2006 in the event that the BhCG value did not significantly decrease, and in giving plaintiff strict ectopic precautions to return immediately to the emergency room with any complaints of pain.

With respect to plaintiff's June 22, 2006 visit to Bronx-Lebanon's emergency room, Dr. Corbett opined that the medical staff obtained a proper history and performed sufficient and timely tests, including a bedside sonogram and repeat BhCG. Plaintiff was admitted for monitoring, and there was no immediate need for surgical intervention, because her vital signs were all within normal limits and she did not complain of any increasing pain and revealed no weakness, shortness of breath, palpitations, paleness, dizziness, tachycardia or hypotensiveness—the signs or symptoms of a ruptured fallopian tube. In addition, since plaintiff was seen by two attending OB/GYN physicians, there was no need to order any additional consultations.

Dr. Corbett explained that based upon the BhCG values, the absence of a gestational sac on the sonogram performed at Lincoln Hospital, the diagnosis of an ectopic pregnancy at Lincoln Hospital, the administration of MTX, and plaintiff's complaints of left lower quadrant abdominal pain, Dr. Afflack correctly diagnosed plaintiff with a left ectopic pregnancy.

Plaintiff signed a consent form authorizing Dr. Afflack to perform a laparoscopy, possible laparotomy, possible oophorectomy, and possible salpingectomy, which informed her of the risks. Upon a further discussion with Dr. Allen, plaintiff elected to proceed with the diagnostic laparoscopy that was scheduled with Dr. Coley on June 23, 2006. Although admitted to the GYN service, plaintiff signed a Departure Against Medical Advice form, which noted that she refused to stay in the hospital and that she understood the risks of death secondary to rupture of ectopic pregnancy. Plaintiff was instructed to return to the hospital immediately if she had increased abdominal pain, vaginal bleeding, paleness and pain.

When plaintiff returned to Bronx-Lebanon on June 23, 2006, her reported pain was 0/10 on the pain scale, and her vital signs and white blood cell count were all within normal limits. Consequently, Dr. Corbett opined that plaintiff was stable and did not have the signs and symptoms of a ruptured fallopian tube. Once Dr. Coley confirmed that plaintiff's BhCG level remained above 7415 and that the MTX shot had failed to resolve the ectopic pregnancy, plaintiff executed a consent form authorizing Dr. Coley to perform a laparoscopy to evaluate her for an ectopic pregnancy. Dr. Corbett opined that the medical staff at Bronx- Lebanon appropriately informed plaintiff of the risks of the procedure, that plaintiff consented to those risks by executing the consent form, and that a reasonable person in the same situation as plaintiff would have consented to the procedure after being informed of those risks. Dr. Corbett further opined that Dr. Coley then took all the necessary precautions to salvage plaintiff's fallopian tube by performing a diagnostic laparoscopy and attempting to perform a salpingostomy. Dr. Corbett also opined that Dr. Coley utilized her best medical judgment when "[d]ue to the extreme dilatation of the fallopian tube as well as the ruptured fimbriated end and a history of 2 ectopic pregnancies" she "decided to perform a salpingectomy as it was considered unlikely that the patient would have a successful pregnancy with the damaged fallopian tube."

In opposition, the affidavit by plaintiff's expert failed to demonstrate the existence of a material issue of fact whether defendants deviated from the applicable standard of care, and even if they did, whether the departure was a competent producing cause of the rupture of plaintiff's left fallopian tube (*see Bacani v Rosenberg,* 74 AD3d 500 [1st Dept 2010], *lv denied* 15 NY3d 708 [2010]).

Generally, "the opinion of a qualified expert that a plaintiff's

injuries were caused by a deviation from relevant industry standards would preclude a grant of summary judgment in favor of the defendants" (*Diaz v New York Downtown Hosp.*, 99 NY2d 542, 544 [2002] [internal quotation marks omitted]). However, a plaintiff's expert's opinion "must demonstrate 'the requisite nexus between the malpractice allegedly committed' and the harm suffered" (*Dallas-Stephenson v Waisman*, 39 AD3d 303, 307 [1st Dept 2007]). If "the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation . . . the opinion should be given no probative force and is insufficient to withstand summary judgment" (*Diaz* at 544; *Giampa v Marvin L. Shelton, M.D., P.C.*, 67 AD3d 439 [1st Dept 2009]). Further, the plaintiff's expert must address the specific assertions of the defendant's expert with respect to negligence and causation (*see Foster-Sturrup v Long*, 95 AD3d 726, 728-729 [1st Dept 2012]).

The majority states that "plaintiff raised issues of fact by submitting the report of an expert who opined that, in light of plaintiff's symptoms, which were indicative of an ectopic pregnancy, and medical history, which included a previous ectopic pregnancy, Dr. Cergnul should have followed up with plaintiff immediately after the results of the BhCG test she ordered on June 6 became available, and that as a result of her failure to do so, plaintiff lost the opportunity to be timely treated with [MTX] and avoid a ruptured fallopian tube."

However, plaintiff's expert ignored Dr. Cergnul's testimony that on June 6 she "ordered beta HCG to be repeated [on June 7] and asked the patient to return the following day to follow-up [sic] results precisely because on the back of your mind you always keep ectopic pregnancy as a possibility." While plaintiff appeared on June 7 for the test, the record establishes that she did not come back the next day to follow up, as instructed by Dr. Cergnul, and did not return to MBD until June 16, when she saw Dr. Borne. Plaintiff did not deny that she was instructed to come back on June 8. Rather, plaintiff testified that she did not recall the name Dr. Cergnul or the appointment with her on June 6.

Dr. Cergnul also testified that the results of the June 7 BhCG test would have been seen by the "covering" physician on duty when it was received by MBD on June 8. Plaintiff's expert did not address Dr. Corbett's opinion that this was an appropriate procedure, and there is no evidence as to when Dr. Cergnul, who was not plaintiff's primary physician, saw those results.

In any event, the expert's opinion that had Dr. Cergnul followed up with plaintiff immediately "the subsequent chain of

events resulting in the rupture of [plaintiff's] fallopian tube would have been avoided," is speculative and thus fails to raise a triable issue of fact as to causation (*see Rivers v Birnbaum*, 102 AD3d 26, 44 [2d Dept 2012]). Plaintiff's BhCG values had decreased from 1975 MiU/mL on June 2 to 1415 MiU/mL on June 5 to 753.4 MiU/mL on June 7. Dr. Takeshige, an attending physician in the Department of Obstetrics and Gynecology at Lincoln stated in his affidavit that plaintiff was medically and hemodynamically stable when she presented at Lincoln on June 16, meaning she was not actively bleeding, her blood test showed normal liver and kidney functions, her ultrasound showed no free fluid in the cul-de-sac and no gestational sac in the uterus (therefore no fetal cardiac activity), and her BhCG levels were below 1500 MiU/mL. The Lincoln physicians reached no definitive diagnosis, at various times writing "consider ectopic pregnancy," "suspicious for ectopic," "question of ectopic vs. missed abortion," and "rule out left ectopic pregnancy." Plaintiff's expert never identified which of the tests performed at Lincoln, had they been performed after June 7 and prior to June 16, would have resulted in the "definitive diagnosis" of an ectopic pregnancy. Nor did plaintiff's expert address Dr. Corbett's opinion that by June 7, 2006, the pregnancy was likely a miscarriage or an ectopic pregnancy that was spontaneously resolving by itself due to the decreasing BhCG levels between June 2 and June 7.

Nor does plaintiff's expert raise an issue of fact as to Dr. Cergnul's alleged malpractice with respect to plaintiff's June 19 visit. Dr. Takeshige stated that on June 16 he discussed both laparoscopic surgery and MTX with plaintiff, including that MTX required at least two additional follow-up visits, on day four and seven, and that there was still the risk of a rupture of the fallopian tube. Plaintiff's expert did not opine that the MTX treatment was untimely or inappropriate. Nor did plaintiff's expert dispute that the effectiveness of MTX therapy required re-evaluation. Plaintiff's expert did not refute Dr. Corbett's assessment that when plaintiff was seen by Dr. Cergnul on June 19, Dr. Cergnul acted appropriately in ordering a repeat BhCG test to determine if the MTX had been effective.

The majority finds that "[p]laintiff's expert's report also raised an issue of fact as to whether Bronx-Lebanon departed from medical standards by failing to provide plaintiff with the option of immediate surgical intervention, in particular, diagnostic laparoscopy, on June 22." The majority rejects defendants' contention that they cannot be held liable for

plaintiff's refusal, against medical advice, to undergo immediate surgery, finding that "an issue of fact exists as to whether plaintiff was offered any meaningful option for surgical intervention, i.e., a procedure that would leave her remaining fallopian tube intact."

The majority's view coincides with the defense expert's interpretation of the entry in Dr. Allen's notes stating, "Don't have time to do a diagnostic laparoscopy. [Patient] refuses to do an exploratory laparotomy." Based on this note, plaintiff's expert opined that there "was a departure from good and accepted medical practice in failing to provide [plaintiff] with the option of immediate (within a reasonable time frame) surgical intervention—particularly, diagnostic laparoscopy." The expert asserted that if Bronx-Lebanon Hospital was unable to do the diagnostic laparoscopy that day, plaintiff "should have been referred to another facility where an immediate laparoscopy could have been performed."

However, plaintiff's expert failed to refute Dr. Corbett's opinion that plaintiff was stable and did not exhibit any signs or symptoms of a ruptured fallopian tube requiring immediate surgery. Furthermore, plaintiff's expert failed to address the fact that plaintiff signed a consent form authorizing Dr. Afflack to perform a laparoscopy, possible laparotomy, possible oophorectomy and possible salpingectomy. While a laparotomy is an open surgery and more invasive than a laparoscopy, its purpose is still exploratory, and it would not have led to the removal of plaintiff's left fallopian tube unless the exploratory surgery showed that that was medically warranted.

Plaintiff's expert also ignored that part of Dr. Allen's note stating, "Patient advised admission to GYN service for a diagnostic laparoscopy in p.m." Instead of availing herself of this and the other procedures offered, plaintiff signed out against medical advice, choosing to proceed with surgery to be performed by Dr. Coley the following morning (*see Ingutti v Rochester Gen. Hosp.*, 114 AD3d 1302 [4th Dept 2014], *appeal dismissed* 23 NY3d 929 [2014]; *Ford v Southside Hosp.*, 12 AD3d 561 [2d Dept 2004]).

The majority also finds that issues of fact exist as to whether the delay in performing surgery was a proximate cause of plaintiff's ruptured fallopian tube. The majority rejects defendants' argument that their conduct could not have proximately caused the rupture because intraoperative rupturing is a well known risk of even a non-negligently performed salpingostomy on the ground that it "assumes that the rupture occurred during surgery, while the record is equally consistent with the fallopian tube having already ruptured before surgery."

However, plaintiff's expert never offered a departure opinion with respect to Dr. Coley's working diagnosis, the timing of the proposed treatment, or her decision to convert the procedure from a diagnostic laparoscopy to salpingostomy to salpingectomy. Nor did the expert offer any evidence to support the conclusion that the rupture occurred before Dr. Coley's surgery or offer any medical evidence demonstrating that had the diagnostic laparoscopy been attempted on June 22 the result would have been different.

Accordingly, I would affirm the order awarding Dr. Cergnul and Bronx-Lebanon summary judgment dismissing the complaint as against them.