■ SELWYN N. BARTHOLOMEW, Respondent, v INA ITZKOVITZ, M.D., Appellant, et al., Defendant. [990 NYS2d 10]—

Order, Supreme Court, New York County (Alice Schlesinger, J.), entered June 25, 2013, which denied the motion of defendant doctor for summary judgment dismissing the complaint as against her, affirmed, without costs.

In December 2008, the decedent was a 73-year-old man with a history significant for hypertension, hernia, hydrocele, arthritis and benign prostatic hyperplasia. He had undergone a transurethral resection of the prostate in 1998, and developed a deep vein thrombosis postsurgically, as a result of which a "bird's nest" filter was placed in the inferior vena cava (IVC) vein to prevent the formation of pulmonary emboli.

On September 22, 2008, the decedent presented to defendant complaining of hematuria, or blood in the urine. Defendant formulated a differential diagnosis of infection, possible prostate malignancy, tumor, kidney stones or obstruction. She did not consider embolism or deep vein thrombosis as a diagnosis, nor did she consider the risk that the bird's nest filter had failed, al-

though the risk of such failure, according to expert evidence, ran as high as 24%.

Defendant ordered tests, including a urinalysis, urine culture, urine cytology, complete blood count (CBC) and complete metabolic panel, a urology consult, and a sonogram of the kidney and bladder, which was scheduled for October 27, 2008. The urine culture was negative for the presence of bacteria; the urine cytology was negative for malignant cells, and the CBC was normal.

On October 11, 2008, the decedent returned to defendant, complaining of stiff legs, lower back pain, knee pain, and fatigue. He reported that the hematuria he had experienced on September 22 had cleared up within three days. Defendant found a small left hernia and "a very large, somewhat tense scrotal sac on the right." Once again, defendant attributed the decedent's complaints to prostate cancer without ruling out any other diagnoses, including life-threatening clots or the failure of the bird's nest filter.

Two days after the second visit, the decedent collapsed at home and could not be revived. The autopsy report determined that the cause of death was a retroperitoneal hemorrhage due to erosion through the inferior vena cava by a strut of the IVC filter.

Defendant doctor described the filter as "[a] device that would be placed in the inferior vena cava that would block any lower extremity clots from traveling to the lungs and causing a pulmonary embolism." She was aware that the filter had been placed in 1998, and that it was still in place when she was treating decedent in 2008. Defendant acknowledged that the decedent's medical history put him at increased risk of clots such as pulmonary emboli and deep vein thrombosis. She considered the history of pulmonary embolism significant enough to list it as a "chronic problem" in his medical chart, so "anyone who met him [would be aware of the] history of pulmonary embolism."

Defendant moved for summary judgment, asserting that her treatment of the decedent comported with good and accepted medical practice. She relied, inter alia, on the expert affirmations of Dr. Elias G. Sakalis, an internist, and Dr. Joshua L. Weintraub, a vascular radiologist. Dr. Sakalis opined that IVC filter erosion was an "exceedingly rare" complication, occurring in 1-2% of cases, but offered no support for his statement. He opined that the decedent's normal hemoglobin and hematocrit on September 22nd "eliminat[ed] the possibility of anemia from internal bleeding," and that the decedent's prostate specific

antigen (PSA) levels on that date were suggestive of metastatic prostate cancer, or at a minimum, prostatitis. Because filter erosion was "exceedingly rare," and the decedent's blood work normal, and because the decedent was not experiencing the primary symptoms of retroperitoneal bleeding, i.e., diffuse abdominal pain and distension, Dr. Sakalis opined that defendant had no reason to consider retroperitoneal bleeding from filter erosion as a possible diagnosis.

Dr. Sakalis similarly opined that none of the decedent's complaints, signs or symptoms on October 11, 2008 were indicative of internal bleeding, much less IVC filter erosion, noting that the decedent did not present with abdominal pain or distension, and that his vital signs were within normal limits. Dr. Sakalis opined that the decedent's complaints of back pain and stiff legs were unrelated to and not indicative of a problem with the IVC filter, noting that "[s]tiffness and back pain are among the most common complaints in the elderly population."

Dr. Weintraub opined that "filter penetration into adjacent structures occurs in less than 1% of patients." He acknowledged that lower back pain and pain in the lower extremities "could be symptoms of a retroperitoneal bleed," yet maintained that the decedent did not present with any signs or symptoms that would have alerted defendant that "his bird's nest filter was migrating through his [i]nferior [v]ena [c]ava." Dr. Weintraub opined that the decedent's complaints were consistent with his known history of a hernia as well as the strong possibility that he was suffering from metastatic prostate cancer. Dr. Weintraub opined, in any event, that even if defendant had discerned that the filter had perforated the decedent's inferior vena cava, no treatment would have altered the patient's outcome since removal of the filter would have entailed an "enormous and extremely invasive surgical procedure that would have essentially required a re-routing of all of his major blood vessels."

Plaintiff opposed the motion, relying, inter alia, on the expert affirmations of a board certified surgeon and a physician board certified in internal medicine and geriatrics. Plaintiff's surgeon opined that defendant departed from good and accepted medical practice by failing to properly consider the decedent's prior medical and surgical history and failing to do a complete workup. He opined that "[s]pecifically, she did not consider the 1998 placement of an IVC filter in formulating an assessment or plan, and failed to consider it in her diagnosis." Plaintiff's surgeon opined that the likelihood of a perforation of the inferior vena cava by filter struts was between 9 and 24%, not 1-2% as defendant's expert had stated, citing to an article in the

Annals of Vascular Surgery. Plaintiff's surgeon opined that the decedent's complaints and medical history should have led defendant to include both a pulmonary embolism and a perforation of the vena cava by the filter in her differential diagnosis.

Plaintiff's surgeon explained that the decedent's symptoms of stiff legs and lower back pain were "classic signs and symptoms of occult retroperitoneal bleeding such as might be encountered with late filter strut perforation of the inferior vena cava and resultant slow leaking of blood into the retroperitoneal space located in the most posterior portion of the abdomen." He opined, citing to the medical literature, that the decedent's leg symptoms were "consistent with femoral neuropathy from pressure exerted by collecting blood on the femoral nerves."

Plaintiff's surgeon opined that the standard of care on September 22 and October 11, 2008 required defendant to order a STAT CT scan, which, he opined, to a reasonable degree of medical certainty, would have identified the problem and allowed for the decedent to undergo life-saving surgery. He disagreed with Dr. Weintraub regarding the feasibility of corrective surgery, opining that prompt placement of a second filter, higher up, together with removal of the perforated filter and repair of the inferior vena cava, was not a prohibitively morbid procedure; and also noted that nonsurgical alternatives were available, including endovascular procedures.

He disagreed with Dr. Sakalis's statement that a patient with retroperitoneal bleeding would present with diffuse abdominal pain and distension, explaining that because such a bleed is contained in the limited space behind the abdominal peritoneal sac containing the solid organs and the GI tract, the rate of blood flow from the perforation would necessarily have been limited. Plaintiff's surgeon opined that the decedent's perforation was a gradual one which worsened over time, consistent with the decedent's normal hemoglobin and hematocrit levels at the September 22, 2008 visit. By the October 11 visit, the decedent had the classic presentation and findings of occult retroperitoneal bleed, i.e., lower back pain from pressure on his retroperitoneal nerves and stiff legs from femoral compressive neuropathy.

Plaintiff's surgeon explained that in patients on beta blockers, like the decedent, "a subtle decrease in systolic blood pressure may be all that is seen on vital signs as the blockers do not allow the normal physiologic response of tachycardia (rapid heart rate) to bleeding and hypovolemia." He opined that the decedent's low systolic blood pressure, with normal pulse, was consistent with a bleeding patient on beta blockers.

Plaintiff's expert internist similarly opined that defendant's failure to consider other diagnoses and her failure to consider signs and symptoms necessitating further medical workup constituted departures from good and accepted medical practice.

The motion court denied defendant's motion for summary judgment dismissing the complaint, reasoning, inter alia, that defendant never considered the decedent's history, including insertion of the filter and the possibility that the filter might have failed or perforated a vessel, and that her focus on the decedent's prostate gland as the most likely culprit led her to fail to consider other possible diagnoses.

We agree, and now affirm. Assuming defendant's submissions make a prima facie case, plaintiff's opposition papers raise triable issues of fact concerning defendant's departures from good and accepted medical practice (see Scalisi v Oberlander, 96 AD3d 106 [1st Dept 2012]; Costa v Columbia Presbyt. Med. Ctr., 105 AD3d 525 [1st Dept 2013]). Plaintiff's expert surgeon opined that defendant's failure to consider the risk of filter failure or the possibility of a clot in her differential diagnosis, in light of the decedent's history and presentation, constituted a serious departure from good and accepted medical practice, and was a substantial factor in causing the ultimate demise of the decedent.

There is, on this record, a sharp dispute as to the likelihood of filter failure. Defendants' experts quantify the risk of such failure as 1%. Plaintiff's expert surgeon, citing the medical literature, opined that the rate of IVC filter erosion is between 9% and 24%. The conflicting expert reports raise a triable question of fact for the jury.

Plaintiff's and defendant's experts also disagree sharply on the treatment available to the decedent had the internal bleeding been detected earlier. While defendant's expert opined that treatment would have consisted of "watchful waiting," plaintiff's surgeon opines that timely surgery to stop the bleeding could have been accomplished with "minimum morbidity and mortality," and furthermore, that nonsurgical, endovascular options were available.

The concurrence dismisses plaintiff's experts' conclusions as "somewhat conclusory," yet engages in speculation itself by questioning whether the decedent, whom it characterizes as not a "totally compliant patient," would have declined to undergo surgery to correct his urgent internal bleeding.

Given the sharp factual disputes on the record, defendant's motion for summary judgment dismissing the complaint was correctly denied. Concur—Mazzarelli, J.P., Acosta, Renwick and Manzanet-Daniels, JJ.

Freedman, J., concurs in a separate memorandum as follows: Although I agree with the IAS court that plaintiff's experts' opinions are "somewhat conclusory," I concur with the majority that the experts have raised a sufficient question of fact as to whether it was a departure not to consider filter failure or a clot as a diagnosis and to order an immediate investigation of decedent's complaints on October 11, 2008. I do note, however, that defendant doctor did schedule a sonogram on that date, albeit one to take place two weeks later. I also note that decedent arrived at defendant's office unaccompanied and in no apparent severe distress. His complaints of stiffness and knee pain, while as it turned out were indicative of IVC filter failure and bleeding, were also general and could have been attributed to a myriad of causes.

I further note that decedent had not been a totally compliant patient, having refused a prostate biopsy despite PSA levels that were indicative of prostate cancer and having refused surgical repair of a hydrocele and hernia. Thus, I question the likelihood that he would have undergone major surgery in a short time.

In short, defendant appears to have been a caring and thorough physician, who missed a diagnosis. Whether that is sufficient to constitute a departure from good and accepted medical practice is a question for the trier of fact.