[5 NYS3d 92]

ANYIE B., as Mother and Natural Guardian of KAILEN L., Appellant, v BRONX LEBANON HOSPITAL, Respondent, et al., Defendants. (And a Third-Party Action.)

First Department, March 26, 2015

**APPEARANCES OF COUNSEL**

*Lisa M. Comeau*, Garden City, for appellant.

*Heidell, Pitoni, Murphy & Bach, LLP*, New York City (*Daniel S. Ratner* of counsel), for respondent.

**OPINION OF THE COURT**

Acosta, J.P.

This medical malpractice action stems from alleged injuries caused during plaintiff's labor and delivery at defendant hospital. Specifically, plaintiff's complaint alleges that defendant Bronx Lebanon Hospital failed to, among other things,

monitor the fetal heart rate (FHR) in light of plaintiff's oligo-hydramnios (low amniotic fluid), and perform a timely cesarean section. Plaintiff claims that, as a result of defendant's departures, her infant daughter Kailen sustained ischemic hypoxia (a loss of oxygen), resulting in severe neurological injuries, including irreparable brain damage, profound retardation, speech difficulties, cerebral palsy, microcephaly, left hemiparesis (weakness), motor and language delays, and cognitive impairment.

Defendant moved for summary judgment dismissing the complaint. In support thereof, it submitted the affirmed report of Adiel Fleischer, M.D. and the affidavit of Michelle R. Lasker, M.D. Defendant argued that there was no evidence of hypoxia during the labor and delivery, nor was there any causal connection between any alleged departure and Kailen's current injuries, since Kailen was healthy at birth. The motion court ultimately dismissed the complaint finding that although "plaintiff may have established a question of fact regarding the existence of hypoxia," she failed to raise triable issues of fact regarding causation (2013 NY Slip Op 33871[U], *3 [Sup Ct, Bronx County 2013]). We disagree and reverse.

A defendant in a medical malpractice action establishes prima facie entitlement to summary judgment by showing that in treating the plaintiff, he or she did not depart from good and accepted medical practice, or that any such departure was not a proximate cause of the plaintiff's alleged injuries (see Scalisi v Oberlander, 96 AD3d 106, 120 [1st Dept 2012]). Once a defendant meets that burden, the plaintiff must rebut the prima facie showing via medical evidence attesting that the defendant departed from accepted medical practice and that such departure was a proximate cause of the injuries alleged (see id.).

Generally, "the opinion of a qualified expert that a plaintiff's injuries were caused by a deviation from relevant industry standards would preclude a grant of summary judgment in favor of the defendants" (Diaz v New York Downtown Hosp., 99 NY2d 542, 544 [2002]). To defeat summary judgment, the expert's opinion "must demonstrate 'the requisite nexus between the malpractice allegedly committed' and the harm suffered" (Dallas-Stephenson v Waisman, 39 AD3d 303, 307 [1st Dept 2007], quoting Ferrara v South Shore Orthopedic Assoc., 178 AD2d 364, 366 [1st Dept 1991]).

Here, in opposition to defendant's motion for summary judgment, plaintiff raised triable issues of fact as to both departure

from good and accepted medical practice and causation. Plaintiff submitted a redacted report from her expert, a doctor board-certified in obstetrics and gynecology, who opined that defendant departed from the standard of care by failing to properly monitor the FHR strips, which would have revealed hypoxia caused by oligohydramnios (insufficient amniotic fluid); failing to perform resuscitative efforts once the FHR tracings were flat, by providing oxygen and performing an amnioinfusion; and failing to perform a cesarean section hours prior to the vaginal delivery. The expert opined that these departures caused Kailen to suffer intrapartum asphyxia and hypoxia, resulting in brain damage and other injuries.

Specifically, plaintiff's expert observed that on December 15, 1995, when plaintiff (41 weeks' gestation) went to defendant Morris Heights Health Clinic, a sonogram noted an amniotic fluid index (AFI) of 2.3 cm., indicating oligohydramnios. The expert stated that the median AFI at 40 weeks is about 12.3 cm. and at 42 weeks is about 11 cm. Oligohydramnios is diagnosed when the AFI is less than 5.0 cm. As a result of the decreased AFI, defendant clinic sent plaintiff to defendant hospital where she arrived at approximately 10:55 p.m.

Plaintiff's expert opined that, while the fetal monitoring strips were initially reassuring during the overnight hours, at about 5:00 a.m. on December 16th, the strips started to show a decrease in the fetal heart rate baseline, with "prolonged decelerations" and "late decelerations" during the night. The tracings then became non-reassuring (abnormal), which was the result of a lack of oxygen or hypoxia to the fetus, who was not tolerating labor with reduced amniotic fluid. Once the tracings became flat, good and accepted standards of practice required oxygen administration to plaintiff, placing her in the left lateral position, and starting an amnioinfusion, which defendant did not do at that time.

Plaintiff's expert further opined that changes observed in the FHR, including a prolonged deceleration manifested as a drop in baseline from 150-155 beats per minute at 5:15 a.m., and at about 6:20 a.m., followed by a decrease in beat-to-beat variability though 6:33 a.m., were indicative of potential hypoxia. The expert stated that defendant also departed from the standard of care by failing to perform a cesarean section between about 11:45 a.m. and 2:10 p.m. on December 16th, during which time period there were long stretches where defendant failed to monitor fetal status and no fetal heartbeat was picked up on

the tracings. When the tracings did pick up at about 2:10 p.m., they were flat. The expert asserted that defendant made no effort to insert an internal fetal heart monitor (an electronic transducer connected to the fetal scalp) during this time and failed to undertake efforts to resuscitate the infant.

The expert noted that plaintiff's membranes ruptured spontaneously at 5:00 p.m., at which time defendant applied an internal heart monitor and the fetal heart tracing appeared reassuring with mild variables and good recovery to baseline. However, at about 5:40 p.m., there was a prolonged deceleration, a slow return to baseline and a loss of beat-to-beat variability. Another late deceleration occurred at about 6:20 p.m., and, it was at this time that defendant began administering oxygen and started an amnioinfusion. Plaintiff's expert stated that, despite these efforts, the fetal heart tracing continued to be flat and non-reassuring until about 9:30 p.m., when a cesarean section should have been performed.

Plaintiff's expert asserted that from 9:30 p.m. (on Dec. 16th) until 1:40 a.m. (on Dec. 17th), the fetus continued to be in distress and continued to suffer from a lack of oxygenation and hypoxia resulting in the infant sustaining the subject brain injuries. The expert further asserted that the fetal monitoring strips showed multiple instances of decelerations, and decreased or minimal beat-to-beat variability for extended periods of time. The expert opined that the decreased variability could not be merely evidence of a fetal sleep cycle, since there were too many instances thereof throughout the strips. The strips were indicative of a fetus in distress and defendant failed to timely undertake proper resuscitative efforts. The expert also asserted that the fetal strips were indicative of hypoxia due to a low amniotic fluid level, which was "2.9," and that the strips were non-reassuring. With respect to the infant plaintiff's injuries, plaintiff's expert asserted that they were not genetic, but, rather, the result of hypoxia during labor, since later genetic testing on the infant in 2008 came back normal.

Further, the expert opined that plaintiff, who was over 40 weeks' gestation, suffered from placental insufficiency, which can cause insufficient blood flow to the placenta; oligohydramnios, a sign of fetal distress; and a decrease in fetal activity, which can lead to hypoxia. Since placental insufficiency was evident in fetal tracings, closer monitoring during labor would have shown hypoxia caused by a low amniotic fluid level. Thus, the expert concluded that Kailen's microcephaly, developmental

delays and mental retardation were more likely than not caused by hypoxia while she was in utero as a result of undiagnosed, and/or untreated oligohydramnios.

Plaintiff's second expert, Dr. Daniel Adler, board-certified in pediatrics and psychiatry and neurology with a special qualification in child neurology, stated that hypoxic-ischemic encephalopathy is the brain injury caused by asphyxia or oxygen deprivation. Impaired blood flow is one of the events leading to intrapartum asphyxia. If brain injury is not suspected at the time of birth, diagnosis can be made by way of clinical observation over time, when visible signs of brain injury such as impaired motor function and delayed developmental milestones are observed.

Dr. Adler asserted that maternal blood supply to the placenta is normally reduced by increased pressure resulting from contractions during labor, which may be augmented by compression of the umbilical cord, normally cushioned by amniotic fluid. However, during oligohydramnios, the cord may be compressed between the fetus and abdominal wall, further restricting oxygen levels to the fetus. Dr. Adler explained that fetal heart monitor tracings that show flat line tracings with reduced or minimal beat-to-beat variability and prolonged or late decelerations in the fetal heart rate are indicators of fetal distress and poor oxygenation to the fetus. Brain injuries resulting from decreased oxygenated blood flow to a fetus can be prevented by, among other things, oxygen administration to the mother, IV hydration, stopping Pitocin, amnioinfusion and emergency cesarean section. Failure to timely respond to non-reassuring tracings or tracings indicative of fetal distress can result in hypoxic-ischemic encephalopathy or brain damage.

Based on Dr. Adler's examination of the infant on July 12, 2012, when she was 12 years old, and plaintiff's expert's redacted report regarding the fetal monitoring strips, Dr. Adler opined that the infant suffered from intrapartum hypoxia, resulting in brain damage that manifested itself as static encephalopathy, microcephaly, left hemiparesis, motor and language delay and cognitive impairment.

Contrary to defendant's assertion, plaintiff's medical evidence was sufficient to defeat summary dismissal of the complaint. Defendant's argument that plaintiff's experts failed to rebut its contention that, in the absence of any signs or symptoms of permanent neurological injury at or near the time of Kailen's birth, there is no medical basis for connecting her

current condition with the "circumstances of the labor and delivery," is unavailing. Dr. Adler's assertions that brain injuries at the time of birth can be diagnosed based on observations over time contradict defendant's contention. In addition, a report prepared by Dr. Joseph Carfi, dated March 21, 2012, based on his physical examination of Kailen, and medical records, including those from defendant and the Center for Congenital Disorders, notes that Kailen was diagnosed at the Center for Congenital Disorders on May 23, 1996, when she was five months old, with microcephaly, and mild developmental delay. By 2012, she suffered significant mental retardation with developmental delays and lack of age appropriate personal independence. Her impairments are permanent and preclude her from living alone as an adult. Thus, although Kailen had excellent Apgar scores and otherwise appeared normal at birth, plaintiff nonetheless raised triable issues of fact as to causation (*Diaz*, 99 NY2d at 544; *see also Hayden v Gordon*, 91 AD3d 819, 821 [2d Dept 2012] [summary judgment not appropriate in medical malpractice action where parties adduce conflicting medical expert opinions]).

*Fernandez v Moskowitz* (85 AD3d 566 [1st Dept 2011]), relied on by defendant does not dictate a different result. In *Fernandez*, this Court found that the defendants were entitled to summary judgment dismissing the complaint on the ground that plaintiff failed to establish a hypoxic-ischemic brain injury. The evidence supporting such a conclusion included normal brain MRI results, early normal development, no signs of delay until the infant plaintiff was two years old, and proof of a genetic condition that explained at least part of the child's condition (visual impairment). Here, in contrast, Kailen had an abnormal CT scan at age five months, MRI results indicative of intracranial abnormality, very early signs of delay that caused her mother to seek treatment by the time she was less than five months old, and a genetic explanation has been ruled out.

Accordingly, the order of the Supreme Court, Bronx County (Stanley Green, J.), entered October 7, 2013, which granted defendant Bronx Lebanon Hospital's motion for summary judgment dismissing the complaint as against it, should be reversed, on the law, without costs, and the motion denied.

RENWICK, FEINMAN, CLARK and KAPNICK, JJ., concur.

Order, Supreme Court, Bronx County, entered October 7, 2013, reversed, on the law, without costs, and the motion denied.