[48 NYS3d 60]

Marino Severino et al., Respondents, v Mark Weller, M.D., et al., Appellants, et al., Defendants.

First Department, February 21, 2017

APPEARANCES OF COUNSEL

*Marulli, Lindenbaum & Tomaszewski*, LLP, New York City (*Gerard J. Marulli* of counsel), for Mark Weller, M.D., appellant.

*McAloon & Friedman, P.C.*, New York City (*Gina Bernardi DiFolco* of counsel), for the New York and Presbyterian Hospital, appellant.

*The Fitzgerald Law Firm, P.C.*, Yonkers (*Ann B. Chase, John M. Daly* and *Mitchell Gittin* of counsel), for respondents.

## OPINION OF THE COURT

RENWICK, J.P.

Summary judgment pursuant to CPLR 3212 permits a defendant to dispose of a case promptly where claims lack merit. It is not intended to deprive a plaintiff of the right to adjudicate claims where factual issues exist. In this case, we adhere to the rule that summary judgment is not authorized in a medical malpractice action where the parties adduce conflicting opinions of medical experts (*see Fernandez v Moskowitz*, 85 AD3d 566 [1st Dept 2011]). Contrary to the dissent's conclusion, the opinions of plaintiffs' experts were based upon facts in evidence and were not conclusory or otherwise insufficient.

This medical malpractice case relates to the care and treatment of plaintiff Marino Severino (Severino), aged 61, who underwent gallbladder surgery at defendant hospital on May 17, 2008. Defendant Dr. Weller was the anesthesiologist for the procedure and postoperatively. In the hours following the surgery, Severino suffered cardiopulmonary arrest, resulting in severe anoxic brain injury, leaving him permanently ventilated in a near-vegetative or vegetative state. Plaintiffs' malpractice

claims, which relate to the postoperative management of Severino's care, allege failure to properly monitor with continuous pulse oximetry, failure to recognize that he was not responding appropriately to opiate pain medication, and failure to timely call a code and commence resuscitation after his witnessed arrest.

We disagree with plaintiffs to the extent they argue that defendants did not meet their initial burden of coming forward with evidence showing the absence of any material issue of fact (*see Sisko v New York Hosp.*, 231 AD2d 420, 422 [1st Dept 1996], *lv dismissed* 89 NY2d 982 [1997]). Defendants relied on expert affirmations by licensed physicians who are board certified in, inter alia, anesthesiology and surgery. The experts opined that there were no departures from the standard of care with respect to the treatment of Severino and that any alleged act or failure to act by defendants did not cause or contribute to Severino's injuries. Specifically, the experts opined that there was no basis to transfer Severino to an intensive care unit since his vital signs were stable. The experts also opined that Severino's nonresponsive condition was not attributable to the doses of morphine, explaining that the limited amounts of morphine received by Severino were insufficient to cause him to become nonresponsive and that there were no signs that he had any adverse reaction to the morphine. Rather, the experts opined that Severino's cardiorespiratory arrest was a sudden and unpredictable event. Finally, the experts opined that Severino was timely and properly resuscitated, ventilated, medicated, and intubated in response to his cardiac arrest.

Accordingly, the burden shifted to plaintiffs to produce evidence in admissible form sufficient to establish the existence of a triable issue of fact (*see Sisko*, 231 AD2d at 422). We find that the affirmations of plaintiffs' experts were sufficient to preclude summary judgment because they raised three potential departures from accepted standards that could have proximately caused Severino's injuries.

First, plaintiffs' experts opined that defendants departed from accepted standards insofar as they failed to identify several red flags of an adverse morphine reaction and, as a result, prematurely discharged Severino to the surgical floor, where he was no longer under continuous pulse oximetry monitoring. The experts stated that the alleged red flags included slow wake-up time, persistent slurred speech, drowsiness, low blood pressure, rapid and shallow breathing, and oxygen saturation of only 95%.

While defendants argue, and the dissent agrees, that the purported red flags did not exist, as a factual matter, there is evidence to support plaintiffs' experts' contentions. For instance, Nurse Meenan, a certified registered nurse anesthetist, testified that Severino woke up slowly, and Nurse Choi's departure note referred to slurred speech, rapid and shallow breathing, and blood pressure more than 20% below the preoperative value. To the extent defendants dispute the significance of a slow wakeup or low blood pressure, this dispute is not properly resolved on summary judgment (*Bradley v Soundview Healthcenter*, 4 AD3d 194, 194 [1st Dept 2004] [conflicting expert opinions "raise issues of fact and credibility that cannot be resolved on a motion for summary judgment"]).

Secondly, plaintiffs' experts opined that defendants departed from accepted standards by failing to recognize that Severino was experiencing an overdose or adverse reaction to morphine. Defendants, however, point to their experts' opinion that the 9 to 13 mg of morphine Severino received was not sufficient to cause an overdose. However, one of plaintiffs' experts opined that, although the amount of morphine (9 to 13 mg) Severino received may not have been excessive for a younger patient without his medical conditions, Severino was at an increased risk of an abnormal reaction due to his age, obesity, and ASA score of III.

Alternatively, defendants argue that plaintiffs cannot establish that morphine-induced respiratory depression proximately caused Severino's cardiac arrest. But again this is the subject of directly conflicting expert testimony, and thus not an appropriate issue for resolution on summary judgment. Plaintiffs' experts both opined that the aforementioned red flags, as well as Severino's pinpoint pupils, were all consistent with an opioid overdose. Contrary to the dissent's assertion, plaintiffs' experts' reliance on the pinpoint pupils is not impermissible "hindsight" reasoning. On the contrary, the pinpoint pupils are cited not as an example of a red flag that defendants failed to identify but as proof that the arrest was in fact narcotics-induced. Indeed, plaintiff's own treating doctor acknowledged that an adverse reaction to morphine was a possible cause of the arrest.

Finally, one of plaintiffs' experts opined that the hospital departed from accepted standards insofar as its staff failed to timely call a code when Severino was found unresponsive. The hospital disputes whether there was any delay as a factual matter. Because the record is not clear as to whether the code

was called immediately (at 11:40 p.m.) or five minutes later (at 11:45 p.m.) this issue cannot be determined on summary judgment. The dissent, however, argues that any delay, even if it existed, was not a proximate cause of Severino's injuries because defendants' experts' opinion that anoxic brain damage starts within four minutes of cardiorespiratory arrest went unrefuted, and, here, it took 15 minutes of chest compressions for Severino to regain a pulse. The dissent, however, ignores plaintiffs' expert's opinion on causation that life saving measures (i.e., bag-mask ventilation and chest compression) "if started immediately can substantially ameliorate the risk of permanent sequelae such as what happened to this patient."

In sum, defendants submitted expert affirmations that established prima facie that they did not depart from good and accepted medical practice or that any such departure was not a proximate cause of Severino's injuries (*see Anyie B. v Bronx Lebanon Hosp.*, 128 AD3d 1, 3 [1st Dept 2015]). In opposition, plaintiffs submitted expert opinions that raised issues of fact as to the following alleged departures: the premature release of Severino from postanesthesia care unit, the failure to identify and treat his overdose or adverse reaction to morphine, and the failure to timely respond to his cardiorespiratory arrest (*see id.*; *Bradley v Soundview Healthcenter*, 4 AD3d 194 [1st Dept 2004] [conflicting expert affirmations present issues of fact and credibility not to be resolved summarily]). Hence, Supreme Court correctly denied defendants' motion and cross motion for summary judgment.

Accordingly, the orders of Supreme Court, New York County (Joan B. Lobis, J.), entered September 9, 2015, which, insofar as appealed from, denied defendants Mark Weller, M.D.'s and the New York and Presbyterian Hospital's motions for summary judgment dismissing the medical malpractice cause of action as against them, should be affirmed, without costs.

ANDRIAS, J. (dissenting). Plaintiff Marino Severino, then 61, underwent gallbladder surgery at the New York and Presbyterian Hospital (NYPH). Dr. Weller was the anesthesiologist. At either 11:40 or 11:45 p.m., almost five hours after he had been moved from the postanesthesia care unit (PACU) to a room on a surgical floor, Mr. Severino had a cardiorespiratory arrest that resulted in severe anoxic brain injury, leaving him in a near-vegetative state.

We all agree that Dr. Weller and NYPH, through expert affirmations supported by medical records and testimony, established prima facie that their treatment of Mr. Severino did not depart from good and accepted medical practice and was not the proximate cause of his injuries (*see Foster-Sturrup v Long*, 95 AD3d 726, 727-728 [1st Dept 2012]). However, the majority affirms the denial of Dr. Weller's and NYPH's motions for summary judgment dismissing the medical malpractice causes of action as against them on the ground that the opinions of plaintiffs' experts raised issues of fact as to whether Dr. Weller prematurely discharged Mr. Severino from the PACU to a surgical floor where there would no longer be continuous monitoring, whether NYPH's staff failed to recognize that Mr. Severino was not responding appropriately to opiate pain medication, which led to an overdose or adverse reaction that caused the cardiorespiratory arrest, and whether the floor nurse failed to timely call a code and commence resuscitation.*

I disagree. The speculative opinions of plaintiffs' experts, based on conjecture, do not suffice to raise an issue of fact. The experts failed to address critical points made by the defense experts or to consider the medical records and testimony establishing that Mr. Severino was awake, alert, oriented, talking and breathing well, and taking in at least 95% oxygen during the five-hour period before he was suddenly found unresponsive in his room. Nor is there any proof in the record that Mr. Severino suffered an overdose of or adverse reaction to opiates, that continuous monitoring would have revealed the presence of respiratory depression before the arrest so that it could have been prevented, or that the alleged five-minute delay in calling a code contributed to Mr. Severino's injuries. Therefore, I dissent and would grant Dr. Weller and NYPH summary judgment dismissing the complaint as against them.

Dr. Weller's and NYPH's experts opined that defendants appropriately discharged Mr. Severino from the PACU to a surgical floor, that there was no need for closer monitoring or transfer to an intensive care unit because his vital signs were stable, that Dr. Weller, as an anesthesiologist, was not responsible for Mr. Severino's treatment once he was transferred, and that NYPH staff medicated Mr. Severino with proper doses of morphine and timely and properly responded to

---

* The claims against the surgical team, Dr. Kluger and Dr. Lee, as well as the claims of lack of informed consent, failure to promulgate or follow hospital rules, and negligent hiring as against all defendants have been dismissed.

his cardiorespiratory arrest. Having found no evidence that Mr. Severino was oversedated or signs of impending respiratory failure in the medical records, the experts concluded that Mr. Severino's cardiorespiratory arrest was a sudden and unpredictable event.

Defendants' experts also opined that plaintiffs' theory of narcotics-induced respiratory depression was pure conjecture in that the medical records showed that the amounts of morphine received by Mr. Severino were insufficient to cause him to become nonresponsive and that there were no signs that he had any adverse reaction to the morphine. The fact that his eyes rolled back was not consistent with a narcotic-induced event but was consistent with a cardiac dysrhythmia or abrupt hypoperfusion.

This shifted the burden to plaintiffs to rebut defendants' prima facie showing with medical evidence that defendants departed from accepted medical practice and that the departure was a proximate cause of the injuries alleged (*see Kristal R. v Nichter*, 115 AD3d 409, 412 [1st Dept 2014]).

Generally, "the opinion of a qualified expert that a plaintiff's injuries were caused by a deviation from relevant industry standards would preclude a grant of summary judgment in favor of the defendants" (*Diaz v New York Downtown Hosp.*, 99 NY2d 542, 544 [2002] [internal quotation marks omitted]). However, a plaintiff's expert's opinion "must demonstrate 'the requisite nexus between the malpractice allegedly committed' and the harm suffered" (*Dallas-Stephenson v Waisman*, 39 AD3d 303, 307 [1st Dept 2007]). If "the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation . . . the opinion should be given no probative force and is insufficient to withstand summary judgment" (*Diaz*, 99 NY2d at 544; *Giampa v Marvin L. Shelton, M.D., P.C.*, 67 AD3d 439 [1st Dept 2009]). Further, the plaintiff's expert must address the specific assertions of the defendant's expert with respect to negligence and causation (*see Foster-Sturrup*, 95 AD3d at 728-729). Here, the opinions of plaintiffs' experts, submitted in opposition to defendants' prima facie showing that the injury sustained by Mr. Severino was the result of an unpredictable and unpreventable respiratory arrest, were based on supposition and hindsight, and were unsupported by the proof, and were therefore insufficient to raise a material issue of fact (*see Manuel H. v Landsberger*, 138 AD3d 490 [1st Dept 2016], *lv denied* 28 NY3d 909 [2016]; *Foster-Sturrup*, 95 AD3d at 728;

*Fernandez v Moskowitz*, 85 AD3d 566, 568 [1st Dept 2011]; *Brown v Bauman*, 42 AD3d 390, 392 [1st Dept 2007]).

In holding that the opinions of plaintiffs' experts raised an issue of fact, the majority first points to the experts' assertion that Mr. Severino should have been transferred to a monitored setting, because he had a slow wakeup time, persistent slurred speech, drowsiness, low blood pressure, rapid and shallow breathing, and oxygen saturation of only 95%. The majority finds that this is supported by Nurse Meenan's testimony that Mr. Severino woke up slowly and Nurse Choi's departure notes, which refer to slurred speech, rapid and shallow breathing, and blood pressure more than 20% below normal. However, Dr. Weller testified that he had independently reviewed Mr. Severino's vital signs, including his respiratory rate, which were "stable," which means "if the blood pressure is in—in a range that is acceptable for that patient I am assessing, the oxygen saturation is adequate, and again, that the patient is awake, is able to communicate." Furthermore, Nurse Choi documented that, while in the PACU, Mr. Severino was alert and oriented (x3). His respiratory rate was between 20 and 30 respirations per minute. When Mr. Severino was accepted by Nurse Onuachu on the surgical floor, she indicated in a note at 7:14 p.m. that he had left the PACU at 7:00 p.m. with relief of pain, and was resting well. The PCA had a reservoir of 94.5 ml, and Nurse Onuachu described Mr. Severino, who denied any pain, as alert and oriented (x3). Vital signs were taken at 8:10 p.m., indicating a temperature of 98 degrees, heart rate 79, respirations 18, oxygen saturation 95% percent and blood pressure 125/67. Between 6:00 p.m. and 8:00 p.m., no doses of morphine were taken.

Dr. Joseph DiNorcia testified and documented that he saw Mr. Severino shortly before he wrote his 9:00 p.m. note, which indicated that Mr. Severino had been transferred to the surgical floor without incident. Mr. Severino was breathing well, and no respiratory distress was evident. Dr. DiNorcia also recorded that Mr. Severino denied pain, was resting comfortably, and was doing well. Mr. Severino's family testified that he was awake and alert before he left the PACU and after he arrived on the floor. Particularly, his wife, Arelis, testified that, at the time of the transfer, Mr. Severino was "normal," and that he was awake and able to talk during the hours she spent with him after the transfer. His son Vladimir testified that after the transfer, he did not see Mr. Severino use the PCA to medicate

himself for pain and that he was "awake," "sounded fine," and told him that he was feeling much better. When Vladimir left the hospital at about 10:30 or 10:45 p.m., Mr. Severino did not have any physical complaints and appeared "[p]erfect. He looked good."

Plaintiffs' experts did not consider this testimony or the medical records indicating that Mr. Severino was stable at the time of the transfer. One of plaintiffs' experts, Dr. Cohen, also premised his opinions, in part, upon his speculative presumption that Mr. Severino had obstructive sleep apnea.

As to the alleged overdose of or adverse reaction to morphine, the medical records indicate that Mr. Severino received 9 mg of morphine over a seven-hour period, including only 1 mg between 8:00 and 10:00 p.m., an hour and a half before the arrest occurred. According to NYPH's expert anesthesiologist, Mr. Severino could have tolerated up to 15 mg of morphine in a single dose, and "the effects of the morphine he received in the PACU was out of his system by the time of the arrest hours later."

In finding a question of fact on this issue, the majority refers to the opinion of plaintiffs' expert that although the morphine Mr. Severino received may not have been excessive for a younger patient, Mr. Severino was at an increased risk of an abnormal reaction due to his age, obesity, and ASA score of III. However, this "mere possibility" amounts to conjecture and lacks the "reasonable degree of medical certainty" required in an expert affidavit in a medical malpractice case (*see Burgos v Rateb*, 64 AD3d 530, 530 [2d Dept 2009]).

Neither of plaintiff's experts opined that the amount of morphine prescribed by Dr. Weller, or that Mr. Severino received, constituted a departure from accepted standards of care or exceeded an acceptable amount for him. Rather, working backward from the injury, the experts claimed that Mr. Severino most likely had not fully metabolized the amount of morphine that he had received, which was likely too much for him, because he had pinpoint pupils several hours after the arrest. While the majority finds this to be evidence of a causal connection between the morphine and the arrest, again, there is no proof of departure, and conjecture alone will not suffice.

The floor nurse saw Mr. Severino at 10:00 p.m., at which time she documented that he remained alert as reflected in a sedation scale of "0." According to her deposition testimony, this meant that Mr. Severino was "fully alert and was comfort-

able" at that time. Plaintiffs' experts' theory that Mr. Severino may have been given more morphine than was documented in the record, or that the PCA machine malfunctioned, is not supported by any evidence and is speculative. The floor nurse testified, consistent with the medical records, that the bag was still "almost full" after the arrest occurred and that she did not detect any problem with the PCA machine at any point during the night. NYPH submitted an affidavit by the site manager of the department of biomedical engineering at NYPH, who stated that no PCA pump of the type used by Mr. Severino was ever presented to her department for service or inspection. Plaintiff did not present any evidence to refute this.

Plaintiffs' experts' contention that the agonal breathing pattern witnessed at 11:40 p.m. was indicative of ongoing respiratory distress is also conjecture. As set forth above, Mr. Severino had left the PACU some four hours earlier and the evidence shows that he was awake, alert and doing well.

The majority also finds an issue of fact exists as to whether the floor nurse failed to timely call a code and commence resuscitation. In support, the majority points to the discrepancies in the medical record as to whether the code was called, and the opinion of plaintiffs' expert that if life-saving measures are started immediately, they can substantially ameliorate the risk of permanent sequela such as Mr. Severino's injuries.

However, although there are conflicting records as to whether the nurse found Mr. Severino unresponsive at 11:40 or 11:45 p.m., the nurse testified that she immediately called for help, that people began responding, and that a code was then called via the overhead public address system. When two doctors responded, within five minutes of hearing the call, other members of the code team were already in place, and resuscitative measures were under way. After 15 minutes of chest compressions, the team was able to regain a pulse. By that time, Mr. Severino had suffered a significant brain injury from the deprivation of oxygen. Neither of plaintiffs' experts opines that the five-minute response time was excessive. While they assert that the nurse delayed in calling for help, that assertion is conclusory and insufficient to raise an issue of fact as to delay (*see Vera v Montefiore Med. Ctr.*, 60 AD3d 408 [1st Dept 2009]). Moreover, one of plaintiffs' experts acknowledged that anoxic brain damage can start within four minutes of an arrest, and plaintiffs' experts did not establish how any purported five-minute delay made any difference to this outcome.

GISCHE and WEBBER, JJ., concur with RENWICK, J.P.; ANDRIAS and SAXE, JJ., dissent in an opinion by ANDRIAS, J.

Orders, Supreme Court, New York County, entered September 9, 2015, affirmed, without costs.